[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-11571

_____

D.C. Docket No. 8:19-cv-00772-VMC-JSS


SAMANTHA RING,

Plaintiff-Appellant,

versus

BOCA CIEGA YACHT CLUB INC.,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 12, 2021)

Before WILLIAM PRYOR, Chief Judge, LUCK, Circuit Judge, and MARKS,* District Judge.

WILLIAM PRYOR, Chief Judge:

---

* Honorable Emily Coody Marks, Chief United States District Judge for the Middle District of Alabama, sitting by designation.

This appeal involves the private-club exception to the Americans with Disabilities Act and the Civil Rights Act of 1964. A member of a yacht club asked to bring her service dog into the clubhouse and argued that she was entitled to do so under the Americans with Disabilities Act. The club responded that it was covered by an exception for "private clubs or establishments exempted from coverage under title II of the Civil Rights Act of 1964," 42 U.S.C. § 12187, and it refused the member's request for an exception to its pet policy. The relationship between the member and the club deteriorated from there. The member filed an administrative complaint with a local civil rights authority, and the club suspended her and then expelled her from its membership. The member sued for discrimination and retaliation under the Americans with Disabilities Act and the Florida Civil Rights Act. The district court granted summary judgment in favor of the club. Because the record does not establish that the club is a "private club" under the Americans with Disabilities Act, we vacate the summary judgment on the discrimination claims. But we affirm the summary judgment on the retaliation claim because the member failed to rebut the club's nondiscriminatory justifications for expelling her.

## I. BACKGROUND

Samantha Ring is a middle-school teacher in St. Petersburg, Florida. She has severe allergies to bees and sunflower seeds and a history of anaphylactic reactions

to both. Ring carries an EpiPen, and she used it twice within a year of initiating this lawsuit after being exposed to sunflower seeds.

Piper is a dog. Ring acquired Piper in 2015 with the intention of giving her basic obedience training and rehoming her. But she quickly discovered that Piper had a talent for killing bees. Piper saved Ring's life by killing a bee while Ring was out on her boat without her EpiPen, so Ring decided to keep Piper and train her to be a service dog. She has since trained Piper to retrieve her EpiPen and to seek help upon command, and she is in the process of training Piper to detect sunflower seeds. Ring testified that Piper has protected her from being stung by bees on seven separate occasions.

The Boca Ciega Yacht Club is located in Gulfport, Florida. It is a tax-exempt nonprofit organization. It is run by volunteers and headed by a volunteer Commodore, who is elected by the general membership. The Club's bylaws include the following mission statement: "1. To promote safe boating activities[;] 2. To promote instruction and education in safe boating and all nautical activities[;] 3. To promote fellowship and camaraderie among the members[;] 4. To be an integral part of the Community of Gulfport." The Club conducts its business at monthly board meetings and general membership meetings. It also conducts some business at "Special Board Meeting[s]," including the suspension of membership privileges. The Club's meetings are not conducted behind closed doors. In fact,

non-members are encouraged to attend a general meeting to learn more about the Club and express interest in joining.

"Membership in Boca Ciega Yacht Club is open to any natural person, regardless of gender, race, or religion, who is a person of good character and 21 years of age or older." Membership applications are submitted using a form available on the Club's website. The form asks applicants for their name, address, and contact information, for information about family members to include on the membership, for boat information (if the applicant owns a boat), and for two personal references, information about any felony convictions, and consent to a background check. The membership form does not ask applicants for member references or about any qualification other than age. Familiarity with boats is not a membership requirement. After an application is submitted, the Club's membership committee vets the applicant to determine whether she is "of good moral character, financially responsible, and [willing] to actively participate in the welfare of the Club." Vetted applications are read at the next board meeting so that objections may be raised, and applicants are introduced for approval by a majority vote at the next general meeting. In the five years before this litigation, 94.6 percent of applications were approved. Neither of the Club's two immediate past commodores, Commodore Southard and Commodore Brown, could recall a time when an application was not approved after making it to the vote by the general

membership. The Club's membership is not formally limited, but it has remained steady for years at around 200 members. Membership dues are $145 a quarter, and members are also required to participate in workdays that are organized each month.

The Club is located on property leased from the City of Gulfport for $1 a year. The lease gives Club members priority to rent the boat slips on the premises but provides that unleased slips will be leased by the City to members of the public. It also requires the Club to allow members of certain community organizations and other City invitees to use the beach area on the premises. And under the lease, the Club is permitted to have one vessel docked at the facility as a liveaboard vessel. Otherwise, members are not allowed to live on their boats. The leased property includes a clubhouse building. The Club regulates the use of the clubhouse building through a "Clubhouse Policies" document. The document provides that the clubhouse is "[n]ot for use by [the] general public," and that "[n]o pets or animals are allowed inside the clubhouse at any time" except for "the 'club's cat[,]' which is a working position in the club to limit unwanted wild animals."

The Club hosts numerous programs for its members and the public. Annual member events include the "Raft Up" party, at which members tie their boats together in Boca Ciega Bay to create a giant party raft, and a Christmas boat

parade. The Club operates a sailing school that is open to the public and comes with a 90-day non-voting membership. And the Club hosts social events like "Paint Your Own Wine Glass Night" that non-members are welcome to attend as "guests" of the members organizing the events. The Club highlights its activities in a monthly member newsletter that is publicly available on the Club's website.

Ring joined the Club in 2007. She found out about the Club after dropping by unannounced on Easter weekend and receiving a sales pitch from a friendly member about how affordable membership was. But her relationship with the Club has been rocky. In 2016, the Board drafted a motion to expel Ring from the membership based in part on the fact that she was living on her boat without permission. But the motion was set aside, and Ring remained a member.

Ring and the Club leadership butted heads again in 2018. The clubhouse is often open to the elements, and bees and wasps sometimes come inside. So in the summer of 2018, Ring sent Commodore Brown a note from her doctor "support[ing] [her] decision to have her service animal [Piper] accompany her at all times." Brown understood the note to be a request for an exemption from the clubhouse pet policy, but he refused to grant an accommodation without some proof that Piper was a real service dog. When Ring argued that she was allowed to bring Piper into the clubhouse under the Americans with Disabilities Act, Brown

6

told her that he had researched the Act and concluded that the Club was exempt as a private club.

Ring continued to bring Piper into the clubhouse. In December 2018, Brown issued Ring a written warning and told her she would be fined for any later violations of the pet policy. Ring threatened to file a complaint with the Pinellas County Office of Human Rights, and Brown told her to feel free to do so. Ring filed the complaint, and the Club received the charge from the Pinellas County Office of Human Rights on January 22. On that same day, the Club fined Ring $150 for bringing Piper into the clubhouse the day before.

On January 27, Ring received notice that a member of the Board had filed an emergency motion to suspend her membership. The motion explained that "Ms. Samantha Ring has lived for three (3) years in Gulfport waters as a non-sanctioned 'liveaboard' despite the provision in [the Club]'s lease with the City prohibiting such liveaboards." And it said that "Ms. Ring has also been stealing City electricity by keeping an extension cord plugged into the City's 110v electrical outlet . . . . As Ms. Ring is well aware, the City strongly objects to boat owners using that electrical power on a constant or ongoing basis." Finally, the motion explained that Ring's actions threatened the Club's future survival by creating a hurdle to the Club's renegotiation of its lease with the City.

7

The Board suspended Ring's membership on January 31. After Ring was suspended, the Board sent Ring a list of reasons for the initiation of the expulsion procedure. The Club completed the process of expelling Ring with a majority vote from the general membership on April 19.

Ring sued the Club on March 29. She alleged one claim of failure to make reasonable modifications under Title III of the Americans with Disabilities Act based on the Club's refusal to let her bring Piper into the clubhouse. She alleged one claim of retaliation under Title V of the Americans with Disabilities Act based on the Club fining, suspending, and targeting her for expulsion after she filed a complaint with the Pinellas County Office of Human Rights. And she alleged one claim of discrimination in violation of the Florida Civil Rights Act. She requested a declaratory judgment as well as an injunction reinstating her membership, dismissing the Club's fines against her, allowing her access to the clubhouse with Piper, and prohibiting the Club from discriminating against disabled people. She also requested compensatory and punitive damages under the Florida Civil Rights Act. *See* Fla. Stat. § 760.11(5).

After both parties moved for summary judgment, the district court granted summary judgment in favor of the Club. Regarding Ring's Title III discrimination claim, the district court concluded that the Club was a private club exempt from Title III. 42 U.S.C. § 12187. Regarding Ring's Title V retaliation claim, the district

8

court concluded that the Club's exemption from Title III meant that the Club was also not covered by Title V. Alternatively, it rejected Ring's retaliation claim on the merits because she failed to prove that the Club's adverse membership actions against her were causally related to her complaint to the Pinellas County Office of Human Rights, and because Ring did not rebut the legitimate nondiscriminatory reasons the Club offered to explain the adverse membership actions. Regarding Ring's state-law claim, the district court concluded that the Florida analogue to the private-club exception was coextensive with the federal exception, and that Ring's state-law claim failed due to the Club's private-club status.

## II. STANDARD OF REVIEW

We review a summary judgment *de novo*, viewing all evidence in the light most favorable to the nonmoving party. *Al-Rayes v. Willingham*, 914 F.3d 1302, 1306 (11th Cir. 2019). "Whether or not an institution is a 'club' within the meaning of [the private-club exception] is a question of law once the underlying facts have been determined." *United States v. Richberg*, 398 F.2d 523, 526 (5th Cir. 1968).

## III. DISCUSSION

We divide our discussion in two parts. First, we address Ring's discrimination claims under the Americans with Disabilities Act and the Florida Civil Rights Act, and we conclude that the district court erred in granting the Club

9

summary judgment based on its status as private club. Second, we address Ring's retaliation claim, and we affirm the summary judgment against that claim based on Ring's failure to rebut one of the Club's proffered nondiscriminatory reasons for its adverse actions against her.

### A. The Record Does Not Establish That the Club Is a "Private Club" Exempt from Federal and Florida Anti-Discrimination Laws.

Ring sued the Club for discrimination under Title III of the Americans with Disabilities Act. Title III provides the following "[g]eneral rule" against discrimination:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). Title III also lists "[s]pecific prohibitions" that follow from the general rule, which make clear that "[d]iscrimination" includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford . . . facilities . . . to individuals with disabilities." *Id.* § 12182(b)(2)(A)(ii). Ring alleges that the Club discriminated against her by failing to modify its pet policy to afford her access to the clubhouse with a service animal as necessitated by her disabilities.

The district court assumed for the purpose of summary judgment that Ring has a "disability" covered by the Act. The Act defines a "disability" as "a physical

or mental impairment that substantially limits one or more major life activities," *id.* § 12102(1)(A), and it defines "major life activities" to include "breathing" and "respiratory . . . functions," *id.* § 12102(2)(A)–(B). The Act further clarifies that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." *Id.* § 12102(4)(D). The Club does not contest that Ring's severe allergies are a disability.

Ring also sued for discrimination under the Florida Civil Rights Act, which provides that "[a]ll persons are entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation without discrimination or segregation on the ground of race, color, national origin, sex, pregnancy, handicap, familial status, or religion." Fla. Stat. § 760.08. It provides a private cause of action for violations of that right. *Id.* § 760.07. Ring alleges that the Club violated the Florida Civil Rights Act by denying her full and equal enjoyment of its facilities based on handicap. Florida courts "construe the [Florida Civil Rights Act] in conformity with the federal Americans with Disabilities Act." *City of Delray Beach v. DeSisto*, 197 So. 3d 1206, 1209 (Fla. Dist. Ct. App. 2016) (alteration adopted) (internal quotation marks omitted). Because the Florida Civil Rights Act does not define the term "handicap," Florida courts look to the Americans with Disabilities Act's definition

11

of a "disability." *Byrd v. BT Foods, Inc.*, 948 So. 2d 921, 926 (Fla. Dist. Ct. App. 2007) (internal quotation marks omitted).

Both the Americans with Disabilities Act and the Florida Civil Rights Act include exceptions for private clubs. Title III of the Americans with Disabilities Act does not apply to "private clubs or establishments exempted from coverage under title II of the Civil Rights Act of 1964." 42 U.S.C. § 12187. Title II of the Civil Rights Act exempts from coverage "private club[s] or other establishment[s] not in fact open to the public." *Id.* § 2000a(e). Neither statute defines any of the terms used in the exception. The Florida Civil Rights Act includes a similar exception for "lodge halls or other similar facilities of private organizations which are made available for public use occasionally or periodically." Fla. Stat. § 760.07. As with the federal exception, the Florida Civil Rights Act does not define any of the terms in the exception. And no reported Florida decision discusses the scope of Florida's private-club exception.

We read the Florida private-club exception to be coextensive with the federal exception. Florida courts "construe the [Florida Civil Rights Act] in conformity with the federal Americans with Disabilities Act," *City of Delray Beach*, 197 So. 3d at 1209 (alteration adopted) (internal quotation marks omitted), including in situations where the two acts use similar but not identical language, *see Byrd*, 948 So. 2d at 926 (interpreting "handicap" in the Florida Civil Rights

12

Act in the light of the definition of "disability" in the Americans with Disabilities Act). We apply that same approach to the Florida private-club exception. Because "disability-discrimination claims under the Florida Civil Rights Act are analyzed under the same framework as [Americans with Disabilities Act] claims, [we] consider[] both sets of claims together." *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1224 n.2 (11th Cir. 2005) (citation omitted).

The Americans with Disabilities Act borrows the private-club exception from Title II of the Civil Rights Act of 1964, which provides for "Injunctive Relief Against Discrimination in Places of Public Accommodation." Pub. L. No. 88-352, § 201(e), 78 Stat. 241, 243. The exception is codified under the heading "Private establishments." 42 U.S.C. § 2000a(e). It provides, "The provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b)," *id.*, including an inn, restaurant, gas station, theater, or other place of public accommodation, *id.* § 2000a(b). The Civil Rights Act does not define any of the terms used in section 2000a(e), but the text of the statute and our precedents guide us to a comprehensive definition of a "private club."

A few things are obvious from the context of the words "private club." A "private club" is a kind of "establishment not in fact open to the public." *Id.*

13

§ 2000a(e). The phrase "not in fact open to the public" connotes that a private club must be private in ways beyond mere private ownership. *Id.* It also suggests that an organization's private-club status be assessed based on how the organization relates to the public "in fact," not just on paper. *Id.* And because the exception is about "[p]rivate establishments," *id.*, and is part of the title of the Civil Rights Act covering "[p]laces of [p]ublic [a]ccommodation," § 201(e), 78 Stat. at 243, we know to focus our attention on a club's physical facilities, not attributes unrelated to the facilities.

The ordinary meaning of the words "club" and "private" bring us closer still to a definition. When the Civil Rights Act was passed, a "club" was understood to be "[a]n association of persons for the promotion of some common object, as literature, science, politics, good-fellowship, etc., esp. one jointly supported and meeting periodically," in which "[m]embership is usually conferred by ballot, and carries the privilege of exclusive use of club quarters." *Club*, *Webster's New International Dictionary* (2d ed. 1959). And the adjective "private" meant "unconnected with others" and "[s]equestered from company or observation." *Private*, *Webster's New International Dictionary* (2d ed. 1959). Both words retained those meanings when the private-club exception was later incorporated by the Americans with Disabilities Act. *Club*, *Webster's Third New International Dictionary* (1993); *Private*, *Webster's Third New International Dictionary* (1993).

14

The Supreme Court and our predecessor circuit have never endeavored to provide a general definition of a "private club," but their decisions sharpen our understanding. In *Daniel v. Paul*, the Supreme Court concluded that a lakeside recreation area open only to 100,000 white members was "simply a business operated for a profit," not a private club, because it lacked "the attributes of self-government and member-ownership traditionally associated with private clubs." 395 U.S. 298, 301–02 (1969). *Daniel* illustrates the requirement that a "private club" be a "club"—a "jointly supported" "association of persons for the promotion of some common object." *Club*, *Webster's New International Dictionary* (2d ed. 1959). Similarly, in *United States v. Richberg*, our predecessor circuit considered "whether the Dixie Diner Club, hastily established on the premises of Richberg's Cafe *subsequent to the initiation of* [*the litigation*], [was] a bona fide club excepted from the [Civil Rights] Act." 398 F.2d at 525. After reviewing facts that made clear the club was a sham, including that some members were not even aware of the name of the club, *id.* at 526–27, the Court concluded that "the Dixie Diner Club was a club in name only, and a facade to permit Richberg's Cafe to continue in its racially discriminatory ways of yesterday," *id.* at 529.

Supreme Court precedent also illustrates the requirement that a "private club" be "private"—"unconnected with others" and "[s]equestered from company or observation." *Private*, *Webster's New International Dictionary* (2d ed. 1959). In

15

*Tillman v. Wheaton-Haven Recreation Ass'n*, the Supreme Court concluded that a swimming club with membership open to white families within a defined geographical area was not a private club under the Civil Rights Act because it lacked a "plan or purpose of exclusiveness." 410 U.S. 431, 432–34, 438 (1973) (internal quotation marks omitted). The Supreme Court has further explained that, to pursue a "plan or purpose of exclusiveness," an organization must act to ensure "seclusion from others in critical aspects of the relationship[s]" between its members. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 620–21 (1984) (internal quotation marks omitted).

The decisions of our predecessor circuit further clarify that an organization is not a private club if it allows outsiders easy access to its facilities through loose membership criteria or guest policies. In *Stout v. Young Men's Christian Ass'n of Bessemer*, for example, our predecessor circuit rejected an assertion of private-club status by a membership organization because "membership [was] open to the general public" with no requirement of "a formal membership application." 404 F.2d 687, 688 (5th Cir. 1968) (internal quotation marks omitted). Likewise, in *Smith v. Young Men's Christian Ass'n of Montgomery, Inc.*, our predecessor circuit rejected a private-club argument because the organization "freely admit[ted] to membership without question almost all who appl[ied]." 462 F.2d 634, 648 (5th Cir. 1972). And in *Anderson v. Pass Christian Isles Golf Club, Inc.*, our

16

predecessor circuit said that a golf course's "arrangements . . . with several local hotels for use of the course by [non-member hotel] patrons [were] sufficient, as a matter of law, to destroy full 'private' club status." 488 F.2d 855, 857 (5th Cir. 1974).

Based on the text of the statute and binding precedent, we can discern a general rule: A "private club" is an organization that uses "self-government and member-ownership," *Daniel*, 395 U.S. at 301, and pursues a "plan or purpose of exclusiveness," *Tillman*, 410 U.S. at 438 (internal quotation marks omitted), by acting to ensure "seclusion from others in critical aspects of the relationship[s]" between members at its facilities, *Roberts*, 468 U.S. at 620. And our precedents make clear that this general rule is judicially administrable.

The district court took a different approach. Rather than derive a general rule from text and precedent, it borrowed a multifactor balancing test from another court. *See United States v. Lansdowne Swim Club*, 713 F. Supp. 785, 795–805 (E.D. Pa. 1989). The district court discussed the following several factors to be balanced:

> (1) the genuine selectivity of the group in the admission of members; (2) the membership's control over the operations of the establishment; (3) the history of the organization; (4) the use of the facilities by non-members; (5) the purpose of the club's existence; (6) whether the club advertises for members; (7) whether the club is for profit or not for profit; and (8) the formalities observed by the club, e.g., bylaws, meetings, and membership cards.

17

It concluded that the factors weighed in favor of private-club status. Other courts have also adopted balancing tests or a totality-of-the-circumstances approach to evaluate assertions of private-club status. *See, e.g.*, *Welsh v. Boy Scouts of Am.*, 993 F.2d 1267, 1276–77 (7th Cir. 1993) (citing *Lansdowne Swim Club*, 713 F. Supp. at 796–97); *Durham v. Red Lake Fishing & Hunting Club, Inc.*, 666 F. Supp. 954, 960 (W.D. Tex. 1987) (discussing, "in order of relative importance, . . . (1) the extent membership is genuinely selective on some reasonable basis; (2) measure of control the members have over the operations of the establishment; (3) manner in which the membership corporation was created; (4) purpose of the membership corporation existing; (5) formalities which many private clubs observe; and (6) general characteristics which many private clubs possess"); *cf. Nesmith v. Young Men's Christian Ass'n of Raleigh*, 397 F.2d 96, 101 (4th Cir. 1968) ("In determining whether an establishment is in fact a private club, there is no single test. A number of variables must be examined[.]").

We reject that approach. Our precedents hold that "[w]hether or not an institution is a 'club' within the meaning of [the private-club exception] is a question of law once the underlying facts have been determined." *Richberg*, 398 F.2d at 526. Reweighing the totality of the circumstances is ordinarily not a preferable way to approach a question of law. "If we are to have multiple factors, we also should have a trial." *Sec'y of Lab., U.S. Dep't of Lab. v. Lauritzen*, 835

18

F.2d 1529, 1542 (7th Cir. 1987) (Easterbrook, J., concurring). "[A]t the point where an appellate judge says that the remaining issue must be decided on the basis of the totality of the circumstances, or by a balancing of all the factors involved, he begins to resemble a finder of fact more than a determiner of law." Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1182 (1989). "To reach such a stage is, in a way, a regrettable concession of defeat—an acknowledgment that we have passed the point where 'law,' properly speaking, has any further application." *Id.* Basing a decision on the totality of the circumstances is "an empty incantation—a mere conjurer's trick that serves to hide" the court's real reasons for its decision. *Holder v. Hall*, 512 U.S. 874, 943–44 (1994) (Thomas, J., concurring in the judgment). The rule of law demands more.

Wherever possible, a general rule is better than "[a] fact-bound approach calling for the balancing of incommensurables." *Lauritzen*, 835 F.2d at 1542 (Easterbrook, J., concurring). Turning to such an approach "when there still remains a good deal of judgment to be applied" invites "unfortunate practical consequences": "equality of treatment is difficult to demonstrate and . . . impossible to achieve; predictability is destroyed; judicial arbitrariness is facilitated; judicial courage is impaired." Scalia, 56 U. Chi. L. Rev. at 1182. Accordingly, "personal rule, whether it be exercised by a single person or a body of persons, should be sovereign only in those matters on which law is unable,

owing to the difficulty of framing general rules for all contingencies, to make an exact pronouncement." *Id.* (quoting *The Politics of Aristotle* bk. III, ch. xi, § 19, at 127 (Ernest Barker trans., Oxford Univ. Press 1946)). Multifactor balancing tests are "a regrettable concession of defeat" in part because "[i]t is rare . . . that even the most vague and general text cannot be given some precise, principled content—and that is indeed the essence of the judicial craft." *Id.* at 1182–83. With a general rule discerned from the text and precedent, we turn our attention to whether the Club is exempt from federal and state anti-discrimination law based on the private-club exception.

The record reveals genuine issues of material fact about the Club's assertion of private-club status. An organization that claims the benefit of the private-club exception bears the burden of proof. *Richberg*, 398 F.2d at 529. Viewed in the light most favorable to Ring, the record does not establish that the Club acts to ensure "seclusion from others in critical aspects of the relationship[s]" between members at club facilities. *Roberts*, 468 U.S. at 620. Because the Club failed to develop an undisputed record that it pursues a plan or purpose of exclusiveness, it is not entitled to the benefit of the private-club exception. The district court erred in granting summary judgment.

To identify the critical aspects of the relationships between Club members, the Club's mission statement and official history are helpful. The Club's stated

20

mission is as follows: "1. To promote safe boating activities[;] 2. To promote instruction and education in safe boating and all nautical activities[;] 3. To promote fellowship and camaraderie among the members[;] 4. To be an integral part of the Community of Gulfport." Three of the Club's goals—to promote safe boating, to promote nautical education, and to be a part of the local community—are inclusive, public-facing endeavors that do not support private-club status. *See Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 546–47 (1987) ("[A]n inclusive fellowship for service based on diversity of interest . . . does not suggest . . . [a] private or personal relationship[.]" (internal quotation marks omitted)).

The Club's goal of "promot[ing] fellowship and camaraderie among [its] members" is consistent with a plan or purpose of exclusiveness. And the Club focuses on that goal in its official version of its origin story. The Club's Facebook profile says the Club was started in the 1940s when a "bunch of characters who wouldn't take no for an answer" tricked the city of St. Petersburg by installing an unpermitted dock under cover of darkness, "while (probably) sipping rum." That story still informs the Club's self-image. In the same section of its profile, it boasts that its members have "been known to throw a party or two (or ten)." We focus on the mutual enjoyment of "fellowship and camaraderie" as a critical aspect of the relationships between Club members.

21

To qualify for the private-club exception, the Club must prove that it ensures its members' seclusion from others as they enjoy fellowship and camaraderie at its facilities, and viewed in the light most favorable to Ring, the record suggests that it does not. For parts of its leased property other than the clubhouse, the Club does not have the authority to exclude members of the public. According to the terms of its lease with the City, the Club "shall allow members of the Gulfport Lions Club, Gulfport Yacht Club, Inc., Gulfport Youth Sailing, Inc., the Sea Scouts[,] and [the City's] authorized invitees and their guests access to the beach area" of the property. The lease contemplates the possibility that slips in the marina not rented by Club members will be leased by the City to members of the public, and the Club recognizes that it does not have the right to keep anyone from getting to her boat on the property.

To be sure, the Club sometimes exercises its ability to exclude non-members from its events. For example, Commodore Southard testified in his deposition that the Club verifies the membership status of people who want to tie up to members' boats at the Club's "Raft Up" event. But the record also contains examples of the Club allowing non-members at social events, including in the clubhouse. The minutes of the board meeting following the Club's 2018 Christmas boat parade reflect that the parade featured "23 boats plus one that called in and asked if they could just crash the parade[,] for a total of 24 boats!" The minutes even mention a

22

non-member "who just came by to find out about the club and membership and stayed and help[ed] cook and clean all night without knowing a soul here— amazing . . . let's make sure to thank her in person when she finally joins the club." Ring testified that it is not unusual for members to spend time at the Club on a weekend and not know anybody there, even in the clubhouse.

In fact, there are numerous ways for members of the public to gain approved access to the clubhouse without even applying for membership. The Club's sailing school is open to the public, and everyone who pays the fee and signs up for lessons receives a 90-day non-voting membership that gives them access to the clubhouse. Non-member parents of participants in the Club's youth sailing programs are allowed in the clubhouse during their children's events. And the Club hosts social events like "Paint Your Own Wine Glass Night" that non-members are welcome to attend. The Club explains that the presence of these non-members in the clubhouse in connection with its programs is consistent with private-club status because non-members are considered guests of the member responsible for the program. But an organization may not preserve its private-club status by labelling the strangers it invites to use its facilities as member "guests." *See Anderson*, 488 F.2d at 857–58. And some Club members are apparently unaware of the Club's interpretation of its guest policy. In a letter the Board attached to the document recommending Ring's expulsion, a youth sailing instructor described an incident

where—to Ring's chagrin—the mother of a student brought her dog into the clubhouse, and he told Ring the woman "*wasn't my guest* but a mother of a sail school student that didn't know the rules" about pets in the clubhouse.

Non-members might not even need these official backdoors to enjoy use of the clubhouse. Ring submitted three statements from non-members who stated they have used the Club's facilities, including the clubhouse, without doing so. The district court discounted these statements, but their descriptions of the lax enforcement of the Club's policies are consistent with other evidence in the record.

The Club's member newsletter—which includes members' phone numbers and email addresses—is available to the public through its website. After the initiation of this litigation, the Club considered moving the newsletter to a members-only section of the site out of concern that more could be done to "protect [its] members from outside people." The practice of publishing summaries of members' activities alongside their contact information runs contrary to the goal of ensuring members' seclusion from others as they enjoy fellowship and camaraderie.

Some evidence suggests the Club does not even ensure its members' seclusion from others as they participate in the Club's internal governance, an activity that is surely central to fostering fellowship and camaraderie in a volunteer-run organization. The Club's general meetings are held at the clubhouse

24

and open to the public so that non-members can attend to learn more about the Club and express their interest in joining. And visitors are apparently welcome even at more sensitive Club meetings. The special board meeting at which the Board recommended Ring's expulsion opened with a board member asking: "Are there any Visitors? If so, please identify yourself and your reason for visiting."

Finally, the record suggests that the Club's membership application process, at least as it operates in actual practice, gives the membership little control over who is admitted. A club cannot ensure its members' seclusion from others when it freely allows others to become members. *See Smith*, 462 F.2d at 648. People interested in joining the Club fill out a written application available online. The Club does not have a cap on membership. Other than being able to pass a background check designed to weed out criminals, potential liveaboards, and people unable to pay dues, there are no standards by which applicants are evaluated; applicants are not required to have a boat or even know how to sail one. At no point must applicants be sponsored by current members or provide member references of any kind. Once an application is reviewed, the applicant meets with the Club's Membership Committee, which brings up applicants' names to the Board to see if there are any objections before their applications are put to a vote by the membership. Fully vetted applications are approved or denied by a vote at the next general meeting. Commodore Southard was unaware of any application

25

being denied at a general meeting during his 16 years as a member, and the Club pointed the Pinellas County Office of Human Rights to only four applications that were screened out at earlier stages of the process, resulting in a 94.6 percent acceptance rate. The Club's practice of admitting virtually every interested person to the membership is not consistent with a practice of ensuring the seclusion of existing members from others.

In summary, the record contains substantial evidence that the Club fails to ensure the seclusion of its members on much of its property and often fails to do so even in its clubhouse. Strangers often mix with members in the clubhouse, and the Club embraces the presence of non-members at social events and even governance meetings. The Club's membership criteria are lax, and it appears from the record that any member of the public who is interested in boating and able to pass a criminal background check is almost guaranteed acceptance. As Commodore Southard put it, Boca Ciega Yacht Club is a "different type of yacht club[]." That news is great for Gulfport residents looking for a way to connect with fellow boating enthusiasts without the fuss and expense associated with some yacht clubs. But it is not great news for the Club's claim to private-club status.

Viewed in the light most favorable to Ring, the record does not support the conclusion that the Club is a private club exempt from Title III of the Americans with Disabilities Act or the Florida Civil Rights Act. The district court erred by

26

granting summary judgment in favor of the Club on Ring's claims of discrimination. On remand, the district court should resolve any disputed issues of material fact and apply the general definition of a "private club" to resolve, as a matter of law, whether the Club enjoys private-club status. *Richberg*, 398 F.2d at 526.

### B. The District Court Did Not Err by Granting the Club a Summary Judgment on the Retaliation Claim.

Ring sued the Club for retaliation under Title V of the Americans with Disabilities Act. 42 U.S.C. § 12203(a). She alleged that the Club retaliated against her for filing an administrative complaint with the Pinellas County Office of Human Rights. She also alleged that she contacted the City about "the illegal disability discrimination she was experiencing on city-owned land," but she never identified her communications with the City as a basis for the Club's alleged retaliation. According to her complaint, the Club's retaliatory actions against her included a fine, a suspension, and ultimately an expulsion for pretextual reasons.

We confine our analysis to Ring's suspension-and-expulsion theory of retaliation. In her complaint, Ring alleged that the Club issued a $150 fine for bringing Piper into the clubhouse in retaliation for her filing an administrative complaint with the County Office of Human Rights. But she made no mention of the fine—or of her Title V claim at all—in her motion for summary judgment or in her opposition to the Club's motion for summary judgment. Because she never

27

made arguments about the fine, the district court focused exclusively on the Club's suspension and expulsion of Ring. Nor did Ring discuss the fine as an adverse action in her opening brief. At most, Ring makes "passing references" to the fine "in the argument section of [her] opening brief," as "mere background to [her] main arguments" about the Club's adverse membership actions. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 682 (11th Cir. 2014) (internal quotation marks omitted). Ring abandoned her retaliation argument about the $150 fine, so we do not consider it.

Title V of the Act provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). The retaliation prohibition in Title V is like the prohibition in Title VII of the Civil Rights Act, so we evaluate retaliation claims under Title V in the same way as claims under Title VII of the Civil Rights Act. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997).

Ring's retaliation claim is not based on direct evidence of the Club's discriminatory motive; as she acknowledges, "[s]eldom is retaliation quite so blatant." Nor does she rely on a "convincing mosaic" theory. *See Smelter v. S.*

28

*Home Care Servs. Inc.*, 904 F.3d 1276, 1288 n.4 (11th Cir. 2018). Because Ring

relies only on circumstantial evidence, we evaluate her retaliation claim under the

*McDonnell Douglas* burden-shifting framework. *Brungart v. BellSouth*

*Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000) (citing *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792 (1973)).

Under the *McDonnell Douglas* framework, "[t]o avoid summary judgment, a

plaintiff must establish a prima facie case of retaliation." *Farley v. Nationwide*

*Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999). "To establish a prima facie

case of retaliation under the [Americans with Disabilities Act], a plaintiff must

show that (1) she engaged in statutorily protected expression; (2) she suffered an

adverse action; and (3) the adverse action was causally related to the protected

expression." *Higdon v. Jackson*, 393 F.3d 1211, 1219 (11th Cir. 2004) (alteration

adopted) (internal quotation marks omitted). After a plaintiff establishes a prima

facie case, the burden shifts to the defendant to articulate legitimate

nondiscriminatory reasons for the adverse action. *Farley*, 197 F.3d at 1336. If the

defendant meets that burden, the plaintiff must "produce sufficient evidence for a

reasonable factfinder to conclude that *each* of the [defendant's] proffered

nondiscriminatory reasons is pretextual" to avoid summary judgment. *Chapman v.*

*AI Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc) (emphasis added). "[A]

reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both*

29

that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). "[A] plaintiff's failure to rebut even one nondiscriminatory reason is sufficient to warrant summary judgment[.]" *Smelter*, 904 F.3d at 1290–91.

Even if we assume that Ring established a prima facie case of retaliation, her retaliation claim fails because she made no effort to rebut one of the Club's nondiscriminatory reasons for suspending and expelling her. The Club says that it suspended and expelled Ring in part because she "was living on her boat as an unsanctioned liveaboard." In the motion to suspend Ring's membership, the Board noted that the Club's lease with the City "prohibits club members from living aboard their boats," and that the Club's by-laws provide that "[m]embership in [the Club] is restricted by the lease agreement with the City," with "[a]ll provisions in the lease . . . [to] be enforced by the Board." Concerns about Ring's status as an unsanctioned liveaboard featured prominently in the Board's resolution to recommend Ring's expulsion by the general membership. And the Club pointed to Ring's liveaboard status in its motion for summary judgment as a reason for her suspension and expulsion. The district court credited the Club's liveaboard justification, citing Ring's failure to rebut the charge as an alternative reason for granting the Club summary judgment on the retaliation claim.

30

Ring never attempted to rebut the liveaboard justification for her suspension and expulsion before the district court. In response to the Club's motion for summary judgment, she denied that her "membership privileges were suspended by the . . . Board for committing fraud on the City of Gulfport by living aboard her boat without permission and stealing electricity from the City's public supply" and that "an overwhelming majority of the general membership voted to expel [her] from [the Club], on the basis that she had been living on her boat without permission and violating club rules for years." But the email and deposition she cited in support of her denials went only to the charge that she had been stealing electricity. And the portion of the report from the Pinellas County Office of Human Rights she cited discussed only "the prima facie elements of retaliation," with no mention of Ring's alleged liveaboard status.

Nor does Ring attempt to rebut the liveaboard justification on appeal. Most of her retaliation argument is directed at the ruling that she failed to establish a prima facie case, not the alternative holding that she failed to rebut the Club's proffered nondiscriminatory reasons. To the extent Ring attempts to rebut the Club's justifications for her suspension and expulsion, she re-characterizes the liveaboard justification as an accusation that she was "spending too much time on her boat," and then ignores it in favor of rebutting the charges that she stole electricity from the City and provided a false address.

31

Ring never proved that the Club's accusation that she was living on her boat in violation of the lease with the City and Club rules was false. In fact, the medical records produced by Ring confirm that by July 2018 she had "move[d] [to] live on her boat house." Under the *McDonnell Douglas* framework, "a plaintiff's failure to rebut even one nondiscriminatory reason is sufficient to warrant summary judgment." *Smelter*, 904 F.3d at 1290–91. Because Ring did not rebut the Club's liveaboard justification for her suspension and expulsion, the district court correctly granted the Club summary judgment on the retaliation claim.

## IV. CONCLUSION

We **VACATE** the summary judgment for the Club on Ring's discrimination claims under Title III of the Americans with Disabilities Act and the Florida Civil Rights Act and **REMAND** for further proceedings consistent with this opinion. We **AFFIRM** the summary judgment for the Club on Ring's retaliation claim.

32