[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12592

_____

JOHN DOE,

                                                    Plaintiff-Appellant,

*versus*

SAMFORD UNIVERSITY,
MALLORY KRUNTORAD,
ED.D. TIM S. HEBSON,

                                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:21-cv-00871-ACA

_____

2                  Opinion of the Court                  21-12592

_____

No. 21-12840

_____

JOHN DOE,

Plaintiff-Appellant,

*versus*

SAMFORD UNIVERSITY,
MALLORY KRUNTORAD,
Ed.D. TIM S. HEBSON,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:21-cv-00871-ACA

_____

Before WILLIAM PRYOR, Chief Judge, JORDAN, Circuit Judge, and BROWN,[*] District Judge.

WILLIAM PRYOR, Chief Judge:

This consolidated appeal presents two questions: first, whether John Doe, a pseudonymous student at Samford University, has stated a claim against the university for a violation of Title IX, 20 U.S.C. § 1681(a), based on a university disciplinary board finding him responsible for sexual assault and suspending him for five years; and second, whether Doe is entitled to proceed under a pseudonym. Because Doe has not plausibly alleged that his suspension was "on the basis of sex," *see id.*, we affirm the dismissal of his claim. And because the dismissal puts an end to the litigation, we dismiss as moot the appeal from the order denying Doe's motion to proceed under a pseudonym.

## I. BACKGROUND

Because one of the consolidated appeals "is from the dismissal of a complaint, we accept the allegations of the complaint as true. We recount the facts as alleged in the complaint. And we construe them in the light most favorable to the plaintiff." *Darrisaw v. Pa. Higher Educ. Assistance Agency*, 949 F.3d 1302, 1303 (11th Cir. 2020) (citation omitted).

---

[*] Honorable Michael L. Brown, United States District Judge for the Northern District of Georgia, sitting by designation.

John Doe, the pseudonymous plaintiff, was a senior at Samford University, a private Christian university. On the evening of Halloween 2020, he attended a party located at an off-campus apartment. He brought with him two pitchers of an alcoholic beverage he concocted. "[T]he drink was, at most, seven percent . . . alcohol."

Jane Roe, another pseudonymous student, arrived at the apartment sometime later. Doe and Roe had never met before. After trying some of the beverage Doe brought to the party, Roe struck up a conversation with him. "Jane Roe commented to [Doe] about the loud noise level at the [p]arty. [Doe] suggested that they go to [a] . . . [f]riend's [a]partment [nearby] where it was quieter so they could talk." Roe agreed and the two left together. "Jane Roe did not appear intoxicated" and "[n]o one stopped [her] from leaving the [p]arty with [Doe]." "From the time Jane Roe met [Doe] to the time she left the [p]arty with [him], approximately twelve minutes passed."

At the friend's apartment, after engaging in small talk, "Jane Roe asked [Doe] if he wanted to 'hook up.'" "John asked Jane if she was sure she wanted to engage in sexual activity with him, and she confirmed that she did." "Several times before and during their consensual sexual intercourse, [Doe] asked Jane Roe for her consent, and Jane Roe expressed consent." "At all times during the consensual sexual intercourse, Jane Roe had control over her speech and bodily movements." And "[a]t all times during the consensual sexual intercourse," Doe believed, based on "Jane Roe's words and

actions," that Roe "understood the who, what, where, when, why, and/or how of the sexual interaction." "After the sexual intercourse ended, Jane Roe re-dressed on her own, left the [f]riend's [a]partment, descended a staircase, and returned to the [p]arty, all without any assistance from [Doe]."

"Upon her return to the [p]arty, Jane Roe told [one witness] that she was sexually assaulted by [Doe]." Roe then walked outside. "Jane Roe's sister . . . arrived at the outside location where Jane was and asked what was going on." By then, Doe had also returned to the party, and he went outside at the request of another partygoer. "A female outside asked [Doe] what he put in Jane Roe's drink. [Doe] responded that he put 'everything in her drink.'" Doe states that he "mean[t] that he [had] made the [alcoholic beverage]."

After "Jane Roe's sister . . . took [Roe] back to [Roe]'s dorm," Roe stated that Doe "raped her, gave her hickeys, and bit her lip and breast." The sister "took photos of Jane's alleged injuries." Roe filed a police report against Doe the next day. "Jane's blood was drawn to test for the presence of drugs," but "John never saw the results of the blood test."

Four days later, "Jane Roe filed a Title IX complaint . . . against [Doe,] alleging that [Doe]" had violated the university's Title IX policy. Specifically, "Jane Roe alleged that [Doe] had raped her on the night of October 31, 2020, when she was incapacitated."

Doe asserts that the initial steps of the investigation were "[i]n clear violation of [the university's Title IX] [p]olicy." The

policy provides that "the [university's] Title IX Coordinator must provide a written notice of allegations [of sexual misconduct] to the parties." It also provides that, "[w]hen the Title IX Coordinator receives a formal complaint of [s]exual [m]isconduct, the Title IX Coordinator will attempt to schedule an initial meeting with the respondent." But, according to Doe, Tim Hebson, the Title IX Coordinator, "did not provide [Doe] with a written notice of the allegations made against him by Jane Roe before [he] was interviewed." And Hebson "never conducted an initial meeting with [Doe] to notify him of Jane Roe's complaint and the alleged policy violations in issue." Doe does not mention whether he received a written notice or met with Hebson at a later date.

Hebson "assigned [Mallory] Kruntorad as the Title IX Investigator to investigate the allegations of [Roe's] [c]omplaint." This investigation was Kruntorad's "first Title IX investigation." Kruntorad "received little to no training about conducting unbiased and impartial Title IX investigations," and "lacked the experience necessary to conduct a Title IX investigation on her own in accordance with the [p]olicy." After emailing Doe about the investigation in early November, Kruntorad "met with [Doe] to take his statement" in mid-November. "Kruntorad never advised [Doe] of the specifics of Jane Roe's allegations against him aside from a claim that [he] raped Jane Roe."

Kruntorad interviewed Roe several days later. "Jane Roe told . . . Kruntorad that she was drugged at the [p]arty and could not consent to the sexual interaction with [Doe]." Roe also stated

"that when [Doe] got her a drink at the party, [Doe]'s back was to her and she 'could not see what was being put in it.'" And she stated that "she started to feel 'fuzzy' when walking to the [f]riend's [a]partment with [Doe]." On an audio recording of Kruntorad's interview with Jane Roe, "Kruntorad can be heard stating, 'I still think, regardless, you couldn't give consent.'"

Doe asserts that the interview was deficient because Kruntorad failed to ask Roe certain questions. Kruntorard "failed to question Jane Roe about whether Jane Roe consumed any alcoholic beverages prior to the [p]arty." She "never questioned Jane Roe about whether she obtained hickeys from sexual activity on another night." And she did not "conduct[] follow-up interviews with Jane Roe or [Doe] during the course of the investigation."

At the end of an eleven-day-long investigation, Kruntorad wrote and provided to Doe and Roe a preliminary investigation report. Doe asserts that it "contained highly prejudicial hearsay statements purportedly made by law enforcement about [his] alleged attack of [Roe] and [his] suspected prior sexual history," and "highly prejudicial and inflammatory statements about [Doe]'s mental health." Still, one witness had "expressed disbelief that [Roe] was drugged." The same witness had "reported that Jane Roe's sister . . . stated that Jane Roe may have received the hickeys on a prior evening." That witness had also reported that "Jane Roe told [a third party] that she consented to sex with [Doe]." But "several witnesses . . . attested to [Roe's] incapacitation." And Kruntorad "found Jane Roe more credible than [Doe]" based on

the statements of those witnesses. The report was accompanied by recordings of the interviews Kruntorad had conducted.

Doe and Roe both responded to the report, as the Title IX policy permits. Roe reiterated "that she believed she was drugged by [Doe] and that she never got physically sick from excess alcohol." And she "was critical of [the witness] who expressed disbelief that she was drugged." Doe "submitted evidence about his [Attention-Deficit/Hyperactivity Disorder] and [Pervasive Developmental Disorder-Not Otherwise Specified], which is high functioning autism." "This evidence was submitted to explain [Doe]'s rigid communication style." According to the complaint, a revised report "found [Doe] to be less credible than Jane Roe based on statements that [Doe] made about immaterial facts."

Separately, Doe lodged objections with Hebson about the investigation. Doe contested the jurisdiction of the university over the complaint. He "questioned the incompleteness and lack of impartiality of [the] investigation." He "express[ed] concern" that Kruntorad failed to do more "to uncover exculpatory evidence." He "requested the full names of all witnesses interviewed in the investigation," "the photographs of Jane Roe's alleged injuries," and "Jane Roe's medical . . . records." He "objected to the inclusion of the recordings in the materials to be provided to the Title IX [h]earing panel" because the report "did not identify . . . the names of the speakers heard on the recording." And he asked that the interview summaries of statements made by parties "who would not be testifying at the hearing be redacted from the investigative

report." The Title IX policy does not appear to require the disclosure of the names of witnesses, but it does prohibit the hearing panel from "rely[ing] on any statement of [a] party or witness" who does not submit to cross-examination at the live hearing.

Doe was not satisfied with Hebson's response. "Hebson refused to provide the names of the witnesses interviewed by . . . Kruntorad," and did not address Doe's request for access to photographs of Roe's injuries and Roe's medical records. Hebson also told Doe that "decisions related to presented information will be decided upon at the hearing," a statement that is consistent with a provision in the policy that the power to determine the admissibility of evidence resides with the hearing panel.

A live hearing took place before a hearing panel over two days in early 2021. Roe and her sister testified. "[F]or the first time, Jane Roe claimed that she consumed alcohol prior to arriving at the [p]arty." And "for the first time, Jane Roe suggested that her incapacitation was the result of drinking too much alcohol, rather than being drugged by [Doe]." Roe's sister testified about "purported injuries that Jane Roe sustained" and "testified that Jane Roe passed out and had no pulse at times outside of the [p]arty." Doe does not mention what evidence he presented or whether he testified, but he alleges that the hearing panel "refused to hear testimony from" the individual who had written a report on Doe's behalf about Doe's autism. He also alleges that "the Title IX Hearing Panel received an un-redacted copy of the Title IX [i]nvestigation [r]eport" that contained statements from non-testifying witnesses.

The hearing panel issued a notice of determination "finding [Doe] responsible for engaging in prohibited conduct" and suspending him for five years. Doe does not describe the notice of determination in much detail, but he alleges that the "[p]anel found that Jane Roe's ability to consent to intercourse with John was impaired by alcohol consumption." And the panel "cited Jane Roe's testimony that she consumed alcohol before the [p]arty."

Doe appealed the notice of determination to a university appeal panel. Doe argued that there was "a biased, impartial, [*sic*] and prejudicial investigation process," and that there were "several procedural irregularities." He also submitted "newly discovered evidence"—a letter from a doctor "opin[ing] that many of Jane Roe's claims were not medically supportable" because "she could not pass out and then awaken and be able to text or have lucid conversations with other students, and [because] [Roe]'s explanation about bruising on her chest could be attributed to prior trauma to the skin."

The appeal panel dismissed Doe's appeal. The "[a]ppeal [p]anel conceded that there were procedural irregularities during the investigation process that were inconsistent with the [p]olicy, largely attributing these [irregularities] to 'inexperience' and 'adjustment' to a new policy." The appeal panel "did not address why [the doctor's] report" would not "affect the outcome of the matter." The appeal panel "determined the [proffered] testimony [regarding Doe's autism] was not relevant but failed to explain the basis of this determination." And the appeal panel "acknowledged

that the [h]earing [p]anel received a copy of the full Title IX [i]nvestigative [r]eport but found that those statements were not considered by the [h]earing [p]anel."

Doe sued the university, Kruntorad, and Hebson. The complaint alleges that the university violated Title IX, 20 U.S.C. § 1681(a), because "gender bias was . . . a motivating factor in [the university's] erroneous finding against [him]" and because he "was not treated as favorably as a female would be treated in a Title IX investigation." In support of his theory of selective enforcement of the policy, Doe alleges that "upon review of [the university's] Clery statistics it appears that there have been at least seven reported rapes." And he alleges that, "[u]pon information and belief, the accused students were all males" and were "treated differently than a female would be treated if accused of a similar offense." The complaint also advances state-law claims against the university for breach of contract and breach of the covenant of good faith and fair dealing, and against all defendants for negligence. The complaint requests declaratory and injunctive relief, as well as compensatory and punitive damages.

Immediately after filing his complaint, Doe filed a motion to proceed under a pseudonym. The university "d[id] not object to [the motion], [and] contend[ed]" that the district court should "seal the record in this case pending the opportunity for counsel to confer regarding entry of an appropriate protective order." The district court denied the motion to seal the entire record and denied Doe's

request to proceed under a pseudonym. Doe appealed the order. And the district court stayed the order pending appeal.

The university moved to dismiss for failure to state a claim. *See* FED. R. CIV. P. 12(b)(6). Regarding the Title IX claim, the university argued that one of the theories of harm mentioned in the complaint—liability based on an erroneous outcome motivated by sex bias—"deviates from the requirements of Title IX" and "has not been adopted by the Supreme Court or the Eleventh Circuit." It argued that the relevant question was instead "whether the plaintiff has pleaded a plausible set of facts demonstrating that plaintiff's sex was the reason for the university's decision." It argued that, under either approach, Doe failed to state a claim because he "ha[d] not alleged facts sufficient to show a particularized causal connection between the outcome and gender bias." And it argued that Doe failed to state a claim under the other theory of harm mentioned in the complaint—selective enforcement—because the complaint lacked facts supporting the assertion that Doe "was not treated as favorably as a female would be treated in a Title IX investigation."

The district court granted the motion to dismiss. It agreed with the university that Doe's theories of harm were at odds with the text of Title IX, but it "analyze[d] his claim[] under those theories" anyway because "Doe framed both his complaint and his argument in response to the motion to dismiss under [those] theories." The district court concluded that Doe had "adequately allege[d] that he was innocent and wrongly found to have committed the offense." But it explained that the complaint fell short under

the erroneous outcome theory because the allegations, taken together, did not "support[] a reasonable inference that anti-male bias caused the erroneous outcome."

The Title IX claim fared no better under the selective enforcement theory. The district court explained that "Doe's statements that a female would be treated more favorably than he was treated are utterly conclusory." And "[e]ven taking all of John Doe's non-conclusory allegations as true, he cannot show that [the university] treats sexual assault complaints against female respondents any differently than it treats sexual assault complaints against male respondents if he cannot point to a female respondent."

The district court dismissed the Title IX claim without prejudice. And it declined to exercise supplemental jurisdiction over the remaining claims, which were all premised on violations of state law. It dismissed those claims without prejudice, too. Doe timely appealed and we consolidated his two appeals.

## II. STANDARD OF REVIEW

"We review *de novo* the dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim." *Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333, 1339 (11th Cir. 2017). We review questions of our jurisdiction under the same standard. *United States v. Amodeo*, 916 F.3d 967, 970 (11th Cir. 2019).

## III. DISCUSSION

We divide our discussion in two parts. We first explain why Doe failed to state a claim for a violation of Title IX. Second, we

explain why the appeal from the order denying the motion to proceed under a pseudonym is moot.

### A. *Doe Failed to State a Claim for a Violation of Title IX.*

Familiar principles govern a motion to dismiss for failure to state a claim. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Because the presumption of truth applies only to facts, the court may disregard "labels and conclusions . . . couched as . . . factual allegation[s]." *Id.* (internal quotation marks omitted).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (internal quotation marks omitted). And when determining whether the complaint crosses "the line between possibility and plausibility of entitlement to relief," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (alteration adopted) (internal quotation marks omitted), "courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer," *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010)

(alteration adopted) (internal quotation marks omitted); *see also Twombly*, 550 U.S. at 554 (holding that allegations of wrongdoing were not plausible because the facts alleged were "consistent with [liability], but just as much in line with a wide swath of" lawful conduct).

Before applying these principles to Doe's complaint, we address a threshold question: the appropriate framework for establishing a violation of Title IX. Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has held "that Title IX is . . . enforceable through an implied private right of action." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998). But "[n]either the Supreme Court nor this Court has established a framework for analyzing Title IX challenges to university disciplinary proceedings." *Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018).

Doe advances two tests for establishing liability for a university disciplinary proceeding, both derived from *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994)—the "erroneous outcome" test and the "selective enforcement" test. "Under [the erroneous outcome] test, a student must show both that he was 'innocent and wrongly found to have committed an offense' and that there is 'a causal connection between the flawed outcome and [sex] bias.'" *Valencia Coll.*, 903 F.3d at 1236 (quoting *Yusuf*, 35 F.3d at 715). Under the

selective enforcement test, a student must allege and ultimately prove "that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's [sex]." *Yusuf*, 35 F.3d at 715.

The university, by contrast, urges the Court to apply a test first developed by the Seventh Circuit: "do the alleged facts, if true, raise a plausible inference that the university discriminated against [the plaintiff] 'on the basis of sex'?" *Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019). This test has been adopted by at least a plurality of our sister circuits. *See, e.g.*, *Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020); *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021); *Doe v. Univ. of Ark. - Fayetteville*, 974 F.3d 858, 864–65 (8th Cir. 2020); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020); *see also Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021) (agreeing with this approach and modifying it to suit review of a motion for summary judgment).

The Seventh Circuit test hews more closely to "the text of the statute and binding precedent" than does *Yusuf*. *Cf. Ring v. Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1158 (11th Cir. 2021) (in the context of another anti-discrimination statute, preferring a text-based rule). It mirrors the statutory prohibition of adverse action "on the basis of sex." 20 U.S.C. § 1681(a). It incorporates the plausibility standard against which factual allegations must be assessed. And its use in other circuits "make[s] clear that this [test] is judicially administrable." *Cf. Ring*, 4 F.4th at 1158. The tests in *Yusuf*,

by contrast, do not capture the full range of conduct that could lead to liability under Title IX. They "simply describe [two] ways in which a plaintiff might show that sex was a motivating factor in a university's decision." *Purdue*, 928 F.3d at 667; *see also Yusuf*, 35 F.3d at 715 ("Plaintiffs attacking a university disciplinary proceeding on grounds of [sex] bias can be expected to fall generally within two categories."). So, "at bottom[,] [the *Yusuf* tests] ask the same question," *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854–55 (7th Cir. 2019), that the Seventh Circuit test "ask[s] . . . more directly," *Purdue*, 928 F.3d at 667. Indeed, even though some circuits have treated *Yusuf* as having established "formal doctrinal tests," *id.*, *Yusuf* itself acknowledges that, "[i]n order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of . . . discriminatory intent," 35 F.3d at 713.

"We agree with the Seventh[] Circuit's approach," with one modification, "and see no need to deviate from the text of Title IX." *Sheppard*, 993 F.3d at 236. The Seventh Circuit test asks whether the facts "raise a *plausible* inference" of a Title IX violation, *Purdue*, 928 F.3d at 668 (emphasis added). And, to be sure, the ultimate inquiry is the "facial plausibility" of the complaint. But facial plausibility is determined by asking whether the facts alleged "allow[] the court to draw the *reasonable* inference that the defendant is liable." *Iqbal*, 556 U.S. at 678 (emphasis added). We ask whether the

alleged facts, if true, permit a reasonable inference that the university discriminated against Doe on the basis of sex.

1.  The Alleged Facts Do Not Permit a Reasonable Inference that the University Discriminated against Doe on the Basis of Sex.

Doe contends that he has pleaded sufficient facts to permit a reasonable inference of sex discrimination, but we disagree. He asserts that the inference is warranted because of the allegations about procedural irregularities at the investigation and hearing stages, "public pressure[] to comply with Title IX," public statements by university officials, and "statistics revealing numerous allegations against male students" raise a reasonable inference of sex discrimination. But, viewed in isolation or collectively, these allegations do not make it plausible that Doe was suspended on the basis of sex. We address each set of allegations in turn.

a.  The Alleged Procedural Irregularities Do Not Make Sex Discrimination Plausible.

Doe's argument that "gross procedural deviations" permit a reasonable inference of sex discrimination fails for two reasons. First, some of the alleged deviations are either conclusory or incomplete. Second, the remaining allegations do not permit a reasonable inference of sex discrimination.

Some of Doe's allegations of procedural irregularities are assertions unsupported by facts. For example, Doe alleges that "[t]he [i]nvestigation [r]eport contained highly prejudicial hearsay statements purportedly made by law enforcement about [Doe]'s alleged attack of [Roe] and [Doe]'s suspected prior sexual history." And he

alleges that the report also "contained highly prejudicial and inflammatory statements about John's mental health." But Doe's allegations that the statements were "prejudicial" and "inflammatory" are "not entitled to the assumption of truth" because these allegations are "labels" and "[un]supported by factual allegations." *See Iqbal*, 556 U.S. at 678–79 (internal quotation marks omitted); *cf. Simpson v. Welch*, 900 F.2d 33, 35 (4th Cir. 1990) (explaining that a complaint was conclusory because the plaintiff "allege[d] that she was 'required to work in places and under conditions where prejudice and bias exist,' but her complaint nowhere allege[d] any specific oppressive conditions or expressions of 'prejudice and bias'" (citation omitted)). And the inclusion of hearsay in the investigation report was not necessarily improper because the Title IX policy provides that the report "may consist of any relevant information," including "any . . . evidence obtained during the investigation," and the prior sexual conduct of an individual accused of sexual assault may be relevant. *See, e.g., United States v. Breitweiser*, 357 F.3d 1249, 1254 (11th Cir. 2004) (finding no error in the admission of the criminal defendant's history of sexual conduct because "[t]he evidence was relevant to show [his] motive, intent, knowledge, plan and preparation, and lack of mistake").

Doe also counts among the procedural irregularities the decision of "[t]he appellate board . . . [to] reject[] all medical evidence showing the falsity of [Roe's] claims," but Doe does not allege sufficient facts for the Court to suppose that this decision was improper. Under the university's Title IX policy, "new evidence" may

supply the basis for an appeal if that evidence "was not reasonably available at the time of the determination regarding responsibility" and "could affect the outcome of the matter." Doe has not alleged that the evidence he submitted to the appeal board—a letter from a doctor—satisfies these requirements. The letter "opined . . . that [Roe] could not pass out and then awaken and be able to text or have lucid conversations[,] . . . and that [Roe's] explanation about bruising on her chest could be attributed to prior trauma to the skin." But Doe has not alleged that this evidence "was not reasonably available at the time of the determination regarding responsibility." For example, he did not allege that he was unaware, prior to the hearing, of the evidence concerning Roe's injuries or her sister's statement about Roe's lapse of consciousness. Doe alleges only that "[t]he [a]ppeal [d]ecision did not address why [the letter] did not rise to the level that would affect the outcome of the matter"—omitting any discussion of the reasonable availability of the letter and of the appeal board's consideration of that requirement.

Doe's remaining allegations of procedural irregularities do not support a reasonable inference that the university acted "on the basis of sex." *See* 20 U.S.C. § 1681(a). A deviation from a Title IX policy is not, in and of itself, a violation of Title IX. *Cf. Gebser*, 524 U.S. at 292 (holding that a school's failure to follow a Title IX regulation "d[id] not itself constitute 'discrimination' under Title IX"). To be sure, that kind of deviation is at least "*consistent* with" sex discrimination. *See Twombly*, 550 U.S. at 554 (emphasis added). But allegations that are "merely consistent with" liability "stop[]

short of the line between possibility and plausibility." *See id.* at 557. And Doe's "bare assertion" that the procedural irregularities are attributable to his sex does not make his speculation plausible. *See id.* at 555–56; *Austin v. Univ. of Or.*, 925 F.3d 1133, 1138 (9th Cir. 2019) (explaining that the plaintiffs had failed to state a Title IX claim "because the [plaintiffs] d[id] not articulate any basis to discern that the administration or outcomes of the disciplinary proceedings were flawed due to the [plaintiffs]' sex"); *Columbia Coll.*, 933 F.3d at 856 (explaining that alleged restrictions on a respondent's "access to documents relevant to the investigation" did not "demonstrate[] an anti-male bias" in part because "th[e] allegation [was] divorced from [sex]—Doe d[id] not allege that females accused of sexual assault were allowed to review materials or that only female victims were allowed to review them"); *Yusuf*, 35 F.3d at 715 ("[A]llegations of a procedurally or otherwise flawed proceeding . . . combined with a conclusory allegation of [sex] discrimination [are] not sufficient to survive a motion to dismiss.").

Doe's allegations permit "obvious alternative explanations . . . [that] suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental*, 605 F.3d at 1290 (alteration adopted) (internal quotation marks omitted). Those lawful explanations include ineptitude, inexperience, and pro-complainant bias. For example, Doe seeks an inference of sex discrimination from the university's failure to redact the portions of the investigative report containing statements from witnesses who did not testify at the hearing, as the Title IX policy requires.

But this failure is "just as much"—if not more—"in line," *see Twombly*, 550 U.S. at 554, with the appeal board's explanation that the hearing panel was still adjusting to the three-month-old Title IX policy. *See* 85 Fed. Reg. 30026, 30028 (May 19, 2020); 34 C.F.R. § 106.45(b)(6)(i) (effective August 14, 2020, requiring "decision-maker(s)" to disregard the testimony of witnesses who do not submit to cross-examination at a live hearing). Indeed, Doe alleges that the appeal board "found that [the improperly unredacted] statements were not considered by the [h]earing [p]anel." And Doe does not dispute this finding. This undisputed finding makes the failure to redact "more likely explained by . . . lawful" mistake than unlawful bias. *See Iqbal*, 556 U.S. at 680; *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999) (explaining that the Supreme Court has "declined the invitation to impose [Title IX] liability under what amount[s] to a negligence standard").

Similarly, the allegations about deficiencies in the investigation are more in line with the appeal board's explanation that the deficiencies are attributable to the investigator's "inexperience." Doe alleges that "Jane Roe's complaint against [him] was [Kruntorad's] first Title IX investigation." He alleges that, "prior to leading the investigation of the [Title IX] [c]omplaint, [Kruntorad] received little to no training about conducting . . . Title IX investigations." And he alleges that Kruntorad "lacked the experience necessary to conduct a Title IX investigation on her own in accordance with the [p]olicy." So, ineptitude—a sex-neutral explanation that does not violate Title IX, *see Davis*, 526 U.S. at 642—is the likelier,

more "obvious . . . explanation" for the investigator's departures from the policy, see Twombly, 550 U.S. at 567.

Moreover, even if evidence of an investigation and hearing that are "inconsistent with ordinary practice . . . may give rise to an inference of bias," Univ. of Ark., 974 F.3d at 865, there is no reason to suppose that this bias concerned Doe's sex. To the contrary, Doe states throughout his complaint that the university favors all complainants and disfavors all respondents in Title IX proceedings. For example, he argues that Samford and other universities have "institutionalize[d] unfair procedures that lead to unfair and unreasonable punishments of students accused of misconduct." (Emphasis added.) He alleges that Samford "announced to its constituency" that, during its "initial assessment" of a Title IX complaint, "the well-being of the complainant is paramount." (Emphasis added.) And he characterizes this announcement as "exhibit[ing] . . . [a] preference for the alleged victim." (Emphasis added.) These allegations, taken together with university's alleged procedural missteps, might permit a reasonable inference that the decision to suspend Doe was motivated by a pro-complainant, anti-respondent bias. But discrimination against respondents is not discrimination "on the basis of sex," see 20 U.S.C. § 1681(a), and "does not permit a reasonable inference of an anti-male bias" "because both men and women can be respondents," Doe v. Univ. of Denver, 952 F.3d 1182, 1196–97 (10th Cir. 2020).

Doe counters that discrimination on the basis of sex may be inferred from the "arguably inexplicable" outcome of the hearing.

*See Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020). Under this theory, "the merits of the decision itself . . . can support an inference of sex bias" "when the degree of doubt" in "the accuracy of the disciplinary proceeding's outcome . . . passes from articulable to grave." *Id.* (internal quotation marks omitted); *see also id.* (drawing that inference because the hearing panel's decision, as alleged, was without an "apparent basis"); *Univ. of Ark.*, 974 F.3d at 865 (holding that the plaintiff stated a Title IX claim in part because "the allegations in the complaint support[ed] an inference that the hearing panel reached an outcome that was against the substantial weight of the evidence"). Doe does not explain why this inference would be "reasonable," *see Iqbal*, 556 U.S. at 678, but presumably the rationale is that the more outrageous the decision is, the less likely it is that any errors were made in good faith. And when the erroneous decision ceases to be consistent with good-faith mistake, the explanation of improper bias becomes sufficiently likely to cross "the line between possibility and plausibility." *See Twombly*, 550 U.S. at 557. Doe asserts that he is entitled to this inference because "the underlying investigation was completed in just ten . . . days," the investigator "failed to even attempt to gather potentially exculpatory evidence," and "[n]either [Roe] nor the hearing panel commented on the flat contradiction between [Roe]'s theories of intoxication." We disagree.

Doe's assertions are either irrelevant to his theory or unsupported by the factual allegations in his complaint. The duration and quality of the investigation are irrelevant because they relate to the

pre-hearing procedure, not "the merits of the decision itself." *Oberlin*, 963 F.3d at 588. And the complaint establishes that the investigator did in fact uncover and disclose to Doe "potentially exculpatory evidence," including the statement of a witness "who expressed disbelief that [Roe] was drugged," "reported" that "Roe told [a third party] that she consented to sex with [Doe]," and "reported that Jane Roe's sister . . . stated that Jane Roe may have received the hickeys on a prior evening."

Doe's allegations also do not cast "grave" doubt on "the merits of the decision" of the university, *see Oberlin*, 963 F.3d at 588, that a preponderance of the evidence supported a finding of responsibility. According to the complaint, Roe testified "that she consumed alcohol prior to arriving at the [p]arty," and she told the investigator that "she started to feel 'fuzzy' when walking to the [f]riend's [a]partment with [Doe]." Roe told others immediately after the sexual encounter "that she was sexually assaulted by [Doe]," and that he "bit her lip and breast." Doe does not dispute that, after the incident, there was "bruising on [Roe's] chest." And "several witnesses . . . attested to [Roe's] incapacitation." For example, Roe's sister testified "that Jane Roe passed out and had no pulse at times outside of the [p]arty." To be sure, the hearing panel credited Roe's testimony despite her inconsistencies about whether she was drunk or had been drugged. But under the Title IX policy, incapacity can be caused "by alcohol *or* drug consumption (whether voluntary or involuntary)." (Emphasis added.) So, Roe's apparent uncertainty about the cause of her alleged incapacitation has little

bearing on whether Roe was in fact incapacitated. And, in the light of Doe's statement to partygoers that he had "put 'everything in [Roe's] drink,'" Roe's initial belief that she had been drugged is understandable, not inexplicable.

One uncited portion of the complaint alleges that the hearing panel made no mention of Doe's inconsistencies in the notice of determination, but this allegation does not alter our conclusion. We regularly permit factfinders to make unstated but implicit credibility determinations in more formal settings than school disciplinary hearings, such as in criminal proceedings. *See, e.g.*, *United States v. Walker*, 799 F.3d 1361, 1363 (11th Cir. 2015) (on review of the denial of a motion to suppress evidence, explaining that we "give substantial deference to the factfinder's credibility determinations, both explicit and implicit." (internal quotation marks omitted)). We cannot hold the hearing panel to a higher standard than we hold district courts. *See Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 88 (1978) ("A school is an academic institution, not a courtroom or administrative hearing room.").

b.  The Alleged Public Pressure and Public Statements
     Do Not Make Sex Discrimination Plausible.

Doe next argues that the complaint contains other facts from which sex discrimination may reasonably be inferred. In particular, he mentions an announcement by the university in 2019 that, during "an initial assessment" of a Title IX complaint, "the well-being of the complainant is paramount"; that the university "promoted an 'It's on Us Initiative' . . . tout[ing] [that] 'every 21

hours there is a rape on an American college campus'"; and that the university "was subjected to . . . pressure" from federal regulators "to comply with Title IX and appear tough on sexual assault." Doe contends that these allegations make plausible his belief that the university yielded to "public pressures to . . . appear tough on sexual assault" by discriminating on the basis of sex.

Again, Doe is mistaken. As already explained, the allegations in the complaint about the university's public statements at most support a reasonable inference of pro-complainant bias, not pro-female bias. And the assertion that public pressure led the university to discriminate on the basis of sex is not supported by facts.

Doe makes a passing reference in the introductory section of his complaint to the so-called "Dear Colleague Letter" issued by the United States Department of Education in 2011. That letter "instructed universities on how to investigate and resolve complaints of sexual misconduct under Title IX." Doe asserts that "[e]ducational institutions . . . continue to overreact to the threat of federal investigations, sanctions, and lawsuits, in part by discriminating against male students on the basis of their sex."

Doe concedes that the Department of Education "formally rescinded the 2011 Dear Colleague Letter on September 22, 2017," long before Doe's hearing. And it is undisputed that the Department promulgated new regulations that require greater procedural protections for the accused, *see* 34 C.F.R. § 106.45, and that the university has updated its Title IX policy to comply with those regulations. Doe's allegations about a government policy that has been

rescinded and replaced do not assist him in crossing "the line be-tween possibility and plausibility of entitlement to relief," *Twombly*, 550 U.S. at 557 (alteration adopted) (internal quotation marks omitted); *see also Columbia Coll.*, 933 F.3d at 855–56 (hold-ing that "generalized allegations" about "the 'Dear Colleague' Let-ter," even when combined with allegations of procedural impro-priety, did not permit a "plausibl[e] infer[ence] that [the] investiga-tion or adjudication was tainted by an anti-male bias").

### c.  The Clery Statistics Do Not Change the Plausibility of the Title IX Claim.

The allegations about the university's Clery report do not assist Doe in stating a Title IX claim because the contents of the report are "factually neutral." *See Twombly*, 550 U.S. at 557 n.5. In his complaint, Doe alleges that that "upon review of [the univer-sity's] Clery statistics it appears that there have been at least seven reported rapes and nine reported cases of fondling"; and that, "[u]pon information and belief," "all" "the accused students were . . . males." But, as the district court explained, "[t]he Clery [r]eport provides statistics of [on-campus] crimes reported to [Samford's Department of Public Safety and Emergency Management], local law enforcement agencies, and Campus Security Authorities." (In-ternal quotation marks omitted.) "The report does not speak to the sex of the person reporting the offense, the sex of the person ac-cused of the offense, whether any school disciplinary proceedings occurred as a result of the report, or what the result of the school disciplinary proceedings was." Assuming—as we must—that Doe's

"information and belief" allegation is truthful, nothing in the Clery report supports an inference that the university opened a single investigation into one of those reported accusations, much less that the university treated a male respondent worse than it treated a female respondent or female accuser.

To be clear, our conclusion that Doe has failed to state a claim rests on an assessment of the plausibility of sex discrimination, and we "do[] not impose a probability requirement." *See Twombly*, 550 U.S. at 556. Doe's assertion of sex discrimination is implausible because some allegations "are no more than conclusions, [and] are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. Other allegations "are merely consistent with [the university's] liability, so they stop[] short of the line between possibility and plausibility of entitlement to relief." *See id.* at 678 (internal quotation marks omitted). Still other allegations establish "more likely explanations" for the university's conduct, including inexperience, ineptitude, and sex-neutral pro-complainant bias. *See id.* at 681. And "[a]s between th[ose] obvious alternative explanation[s] for the [university's conduct], and the purposeful, invidious discrimination [Doe] asks us to infer, [sex] discrimination is not a plausible conclusion." *See id.* at 682 (citation and internal quotation marks omitted).

2. The Title IX Claim Also Fails Under the *Yusuf* Tests.

Because the two *Yusuf* tests are no more than fact-specific applications of the Seventh Circuit test, *see Purdue*, 928 F.3d at 667, it follows from Doe's failure to satisfy the latter that Doe has failed

to satisfy the former as well. Doe has not satisfied the erroneous outcome test because he has not "allege[d] particular circumstances suggesting that [sex] bias was a motivating factor behind the erroneous finding." *See Yusuf*, 35 F.3d at 715. Instead, the "complaint itself identifies a number of other, [sex]-neutral factors that may have led to the panel's determination." *See id.* at 714.

Nor has Doe satisfied the selective enforcement test. To state a claim under that test, a plaintiff must plausibly allege "an inconsistency" between his treatment by the university and the university's treatment of a similarly situated member of the other sex. *See id.* at 716. Doe relies on the Clery report for that purpose, but that report does not contain sufficient information to identify a comparator and determine whether "the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's [sex]." *See id.* at 715. "Without nonconclusory allegations that the male students were treated any differently than similarly situated female students based on sex, the selective enforcement theory fails." *Austin*, 925 F.3d at 1138.

## B. The Appeal from the Denial of the Motion To Proceed under a Pseudonym is Moot.

Our affirmance of the dismissal of the Title IX claim renders moot the appeal from the denial of the motion to proceed under a pseudonym. Because Doe has not argued that the district court erred by declining to exercise supplemental jurisdiction after dismissing the Title IX claim, he has forfeited any such argument. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir.

2014). And with no litigation remaining in the district court, we are unable to "give [Doe] meaningful relief" with respect to the appeal from the denial of the motion to proceed under a pseudonym. *See Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1216 (11th Cir. 2009) (internal quotation marks omitted). That appeal is moot.

## IV. CONCLUSION

We **AFFIRM** the judgment in favor of the university. We **DISMISS AS MOOT** the appeal from the denial of the motion to proceed under a pseudonym.

21-12840                JORDAN, J., Concurring                1

JORDAN, Circuit Judge, concurring:

I join Parts I, II, III.B, and IV of the majority opinion. As to Part III.A, I concur in the judgment. I agree that Mr. Doe has failed to allege facts that would allow a court to plausibly infer that Samford University discriminated against him "on the basis of sex" in violation of Title IX, 20 U.S.C. § 1681(a). But I have different thoughts about how to apply *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), in a case like this one.

I

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). As the majority notes, this pleading standard is by now a familiar one. Familiarity, however, does not always mean clarity. Let me try to explain the issues as I see them, acknowledging that I am not the first to flag them. *See, e.g., McCauley v. City of Chicago*, 671 F.3d 611, 620–29 (7th Cir. 2011) (Hamilton, J., dissenting in part).

A

The Supreme Court has told us that plausibility means something more than possibility or speculation but something less than probability: "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at

2                    JORDAN, J., Concurring                    20-10709

678. *See also Twombly*, 550 U.S. at 556–57.   On the surface, this seems like an acceptable framing of the pleading standard, but there are linguistic problems when one digs a bit deeper.

First, the word plausible connotes a level of uncertainty—and even doubt—about the truthfulness of the claim.  Second, plausible and probable mean essentially the same thing. *See, e.g.,* 2 BLACK'S LAW DICTIONARY 1392, 1454 (11th ed. 2019) (defining plausible as "[c]onceivably true or successful" and "possibly correct or even likely[,] reasonable" and probable as "[l]ikely to exist, be true or happen"); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1346, 1397 (4th ed. 2006) (defining plausible as "[s]eemingly or apparently valid, likely, or acceptable[,] credible" and probable as "[l]ikely to happen or to be true" and "likely but uncertain, *plausible*") (emphasis added); 2 SHORTER OXFORD ENGLISH DICTIONARY 2238, 2352 (5th ed. 2002) (defining plausible as "seemingly reasonable or *probable* (though speculative)," and probable as "demonstrable, provable…[a]lso *plausible*") (emphases added).  They are even treated as synonyms of each other. *See* BURTON'S LEGAL THESAURUS 407, 426 (3d ed. 1998) (using "*probabilis*" [a Latin word meaning probable] as a synonym of plausible and using "plausible" as a synonym of probable).  The Supreme Court has, unfortunately, failed to acknowledge that there is "an incredibly thin line" between plausible and probable. *See* Matthew Fischer, <u>Ashcroft v. Iqbal</u>: *The Supreme Court's Attempt to Clarify* <u>Bell Atlantic v. Twombly</u> 18 (No. 2)

21-12840                JORDAN, J., Concurring                3

Competition, J. Anti. & Unfair Comp. L. Sec. St. B. Cal. 56, 73 (2009).

Maybe the Supreme Court thinks that any difficulties in figuring out the daylight between plausible and probable can be solved by reliance on judicial experience and common sense. *See Iqbal*, 550 U.S. at 679. Yet these traits—which are not objectively uniform across the federal judiciary—have their own analytical difficulties. *See Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 965 n.5 (11th Cir. 2020) (en banc) (Jordan, J., dissenting).

To make things more complicated, in several cases decided after *Twombly* and/or *Iqbal*, the Supreme Court has reaffirmed that Rule 8 only requires a short and plain statement of the claim. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (explaining that *Twombly* does not constitute a return to the old fact-pleading system and that a complaint "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests'") (quoting *Twombly*, 550 U.S. at 555); *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) ("Petitioners stated simply, concisely, and directly events that, they alleged, entitled them to damages from the city. Having informed the city of the factual basis for their complaint, they were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim."). Exactly what these cases mean in the *Twombly/Iqbal* universe is not exactly clear. But I think they at least caution against reading the pleading standard as overly demanding.

## B

Then there is the Supreme Court's statement in *Twombly*, 550 U.S. at 557, repeated in *Iqbal*, 556 U.S. at 678, that "[f]actual allegations that are merely consistent with a defendant's liability fall short of being facially plausible." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (internal quotations and citations omitted). That concept is sometimes referred to as "obvious alternative explanations" for the challenged conduct. *See* Maj. Op. at 23.

In my view, this concept is difficult to justify at the pleading stage, where proof of the claim is not required. "[O]ne cannot at the same time rationally dispense with a 'probability requirement' to determine 'plausibility' yet conclude that something is not 'plausible' because there are other 'more likely explanations.' No sense can be given of 'more likely' except 'more probable.'" Ronald J. Allen & Alan E. Guy, *Conley as a Special Case of Twombly and Iqbal: Exploring the Intersection of Evidence and Procedure and the Nature of Rules*, 115 Penn St. L. Rev. 1, 37 (2010). *See also Swanson v. Citibank, N.A.,* 614 F.3d 400, 404 (7th Cir. 2010) ("[I]t is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences.").

As I see it, the problem is particularly acute in a case alleging discrimination, where the critical issue is often the defendant's intent and the proof on that issue is often circumstantial. Imagine a Title VII case where a plaintiff alleges in his racial discrimination

21-12840                JORDAN, J., Concurring                5

complaint (a) that his employer, when terminating him, said that the dismissal was due to his poor job performance (his division's financial performance was below expected standards), and (b) that this purported reason was pretext for racial discrimination (although his division's performance was below par compared to other years, it was the highest (in a down year for the company) compared to all other divisions, whose supervisors remained employed). In such case, I suggest that it is virtually impossible for a court to figure out, at the pleading stage, which factual assertion is the more likely (i.e., more plausible) one. On the one hand, the plaintiff's division did perform poorly, as the employer asserted. On the other hand, the plaintiff's division was the best performer when compared to all the other divisions, and none of the other division supervisors lost their jobs. If a Title VII plaintiff is not required to plead a prima facie case of discrimination in his complaint to survive a motion to dismiss, *see Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002), then how is a court supposed to figure out at the pleading stage which explanation is the more plausible in this hypothetical? *Cf. Doe v. Univ. of Denver,* 1 F. 4th 822, 830–36 (10th Cir. 2021) (addressing, at summary judgment, pretext in a Title IX discrimination case brought by a male student charged with sexual misconduct); *Garrett v. Univ. of S. Fla. Bd. of Trs.*, 824 F. App'x 959, 966–67 (11th

6                    JORDAN, J., Concurring                    20-10709

Cir. 2020) (addressing, at summary judgment, pretext in a Title IX retaliation claim brought by a victim of sexual assault).[1]

In response to this quandary, one commentator has suggested that courts use a "confidence analysis" in cases involving circumstantial allegations. *See* Luke Meier, *Probability, Confidence, and* Twombly's *Plausibility Standard*, 68 S.M.U. L. Rev. 331, 380–81 (2016). But that metric—though analytically interesting—does not provide any practical or helpful guidance to courts on the ground. If a court uses the "merely consistent" concept, it will in essence be deciding the issue of pretext at the motion to dismiss stage, where a complaint must be allowed to proceed "even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks and citation omitted).

Given that the Supreme Court has used the "merely consistent" concept in a case involving claims of intentional discrimination, *see Iqbal*, 556 U.S. at 678, and that our circuit has followed suit in some cases, *see, e.g., Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010), I do not fault the majority for doing the same here. *See* Maj. Op. at 23. But that does not mean that the "merely consistent" formulation is appropriate or workable in a case like this one. For one thing, it conflicts with our obligation to draw reasonable inferences in the plaintiff's favor

---

[1] More on *Swierkiewicz* a bit later.

at the Rule 12(b)(6) stage even when the competing inferences are equally plausible. *See, e.g., Worthy v. City of Phenix, Ala.,* 930 F.3d 1206, 1214 (11th Cir. 2019) ("[A]t [the motion to dismiss] stage, when there are two equally plausible ways to read a complaint, we should adopt the reading that is most favorable to [the plaintiff].").

Indeed, several circuits have cautioned against relying on the "merely consistent" (i.e., "alternative explanation") concept in Title IX cases. For example, in *Doe v. Columbia University,* 831 F.3d 46, 57 (2d Cir. 2016), the Second Circuit rejected the district court's conclusion that any alleged bias in favor of the complainant "could equally have been—*and more plausibly was*—prompted by lawful, independent goals, such as a desire. . .to take allegations of rape on campus seriously and to treat complainants with a high degree of sensitivity." It emphasized that a court is "obligat[ed] to draw reasonable inferences *in favor* of the sufficiency of the complaint," and explained that "*Iqbal* does not require that the inference of discriminatory intent supported by the pleaded facts be *the most plausible* explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is plausible." *Id.* The Sixth and Ninth Circuits have taken similar approaches. *See Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) ("[O]ne plausible explanation is that the Board discredited all males, including Doe, and credited all females, including Roe, because of gender bias."); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 948 (9th Cir. 2020) ("Sex discrimination need not be the only plausible explanation or even the most plausible explanation for a Title IX claim to

proceed."). These cases make sense to me, and I would likewise not use the "merely consistent" concept here.

## II

I agree with the majority's articulation of the substantive Title IX standard. *See* Maj. Op. at 16–19. This standard is not inconsistent with the recent decision in *Bostock v. Clayton Cnty.,* 140 S. Ct. 1731, 1739 (2020) (using but-for causation for Title VII), as some courts have noted. *See Sheppard v. Visitors of Va. St. Univ.*, 993 F.3d 230, 236–37 (4th Cir. 2021). The more difficult question is whether Mr. Doe's complaint alleges a plausible claim of sex discrimination under Title IX.

## A

In *Twombly*, 550 U.S. at 563, the Supreme Court cited its prior decision in *Swierkiewicz* with approval. *Swierkiewicz* held that a Title VII plaintiff need not allege a prima facie case of discrimination to survive a motion to dismiss, *and* that the complaint in that case "easily" stated a claim for relief. *See* 534 U.S. at 514–15. In his complaint, the plaintiff in *Swierkiewicz* "alleged that he had been terminated on account of his national origin in violation of Title VII and on account of his age in violation of the ADEA." *Id.* at 514. The complaint "detailed the events leading to his termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination. These allegations g[ave] [the defendant] fair notice of what [the plaintiff's] claims [were] and the grounds on which

21-12840                    JORDAN, J., Concurring                    9

they rest[ed].  In addition, they state[d] claims upon which relief could be granted under Title VII and the ADEA." *Id.* (citations omitted).[2]

Aside from conclusory claims that his demotion and termination had been on account of his national origin and age, the plaintiff in *Swierkiewicz*  alleged that he had done his job in a "satisfactory and exemplary manner;" that his replacement after the demotion was "far less experienced and less qualified;" that his supervisor had said he wanted to "energize" the department in question; that he had been "isolated" after his demotion; that there were several years of "ongoing discrimination on account of his national origin and age;" that his grievances were not addressed or responded to; that the company had "no valid basis" to fire him; and that his national origin and age were "motivating factors" in the termination decision. *See* Complaint at 4–6 ¶¶ 18, 22, 23, 29, 31, 36, 37, *Swierkiewicz v. Sorema, N.A.*, 86 Fair Empl.Prac.Cas. (BNA) 1324 (S.D.N.Y. 2000).  Because the complaint in *Swierkiewicz*—which was relatively sparse—was sufficient to state plausible discrimination claims under Title VII and the ADEA, figuring out the sufficiency of Mr. Doe's Title IX discrimination claim is no easy matter.

---

[2] For ease of reference, a copy of the complaint in *Swierkiewicz* is attached as an appendix.

In most cases, procedural irregularities in a university's investigation of a sexual assault claim and an alleged erroneous outcome in a subsequent disciplinary proceeding will not, by themselves, make out a plausible Title IX claim of sex discrimination. *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994) ("[A]llegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss."). *See also Doe v. Univ. of Dayton*, 766 F. App'x 275, 281–82 (6th Cir. 2019). But as the number of irregularities increases, or the irregularities become more serious (for example, a failure to interview the accused's witnesses), or the erroneous outcome becomes more glaring, the needle starts moving toward plausibility. *See Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020) ("[W]hen the degree of doubt passes from articulable to grave, the merits of the decision itself, as a matter of common sense, can support an inference of sex bias.") (internal quotation marks omitted). *Accord Menaker v. Hofstra Univ.,* 935 F.3d 20, 35 (2d Cir. 2019) (criticizing the district court for not adhering to the Rule 12(b)(6) standard in "minimiz[ing] or explain[ing] away…clear procedural irregularities"); *Doe v. Miami Univ.*, 882 F.3d 579, 593–94 (6th Cir. 2018) (concluding that the plaintiff's allegation that "every male student accused of sexual misconduct…was found responsible for the alleged violation" showed a "pattern of gender-based decision-making" in the university's Title IX investigations); *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) (ruling that a Title IX investigator's basis

21-12840               JORDAN, J., Concurring               11

for believing the complainant was "perplexing" given that she never spoke with the complainant directly); *Doe v. Univ. of Ark.-Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020) (concluding that the hearing panel's decision to credit the complainant's claim that she was incapacitated and therefore could not consent was "against the substantial weight of the evidence"); *Schwake*, 967 F.3d at 949 (finding sex discrimination in part due to the university's "gender-based decision[-]making against male respondents in sexual misconduct disciplinary proceedings").

Here, it seems to me that Mr. Doe's collective allegations of procedural irregularities fall short of the plausibility mark. *See Doe v. Princeton Univ.,* 790 F. App'x 379, 384 (3d Cir. 2019) (plaintiff's grievances about the investigative process were insufficient to make out a Title IX discrimination claim because none of the facts alleged "indicat[ed] that any of [the] alleged unfavorable treatment was due to his sex"). Starting with the purported lack of notice, Mr. Doe was told before his first interview that there was an allegation that he had raped Ms. Roe. Although Mr. Doe was not provided with specifics, he knew what the basic charge was before he met with the investigator for his interview. As to the allegedly inflammatory statements made by law enforcement (the substance of which Mr. Doe did not include in his complaint), I do not view their inclusion in the investigative report as an irregularity. Simply stated, there is no prohibition in Samford's Title IX policy against the inclusion of hearsay in that type of report. With respect to the rejection of the medical evidence by the appeal board, I agree with

the majority that Mr. Doe has not alleged (i.e., explained) why that evidence was not reasonably available to him before the hearing. As a result, there is no reasonable inference that the appeal board committed an error in refusing to consider the evidence.   The failure to redact the portions of the investigative report containing the statements of witnesses who did not testify at the evidentiary hearing is more concerning. But the appeal board attributed that irregularity to inexperience and adjustment to the new Title IX policy, and Samford's policy did not permit consideration of those statements.[3]

Turning to the allegedly erroneous outcome, Samford's decision finding Mr. Doe responsible does not appear—based on the allegations in the complaint—to be glaringly wrong.  Ms. Roe testified at the hearing and explained that her ability to consent to intercourse with Mr. Doe was impaired by alcohol consumption. Although Ms. Roe had initially claimed that she had been drugged by Mr. Doe, the hearing panel knew about the prior inconsistent claim and was able to judge the credibility of Ms. Roe (and, for that matter, Mr. Doe). *Cf. Rossley v. Drake Univ.*, 979 F.3d 1184, 1193 (8th Cir. 2020) ("We conclude. . .that whatever the deficiencies in

---

[3] Mr. Doe does not allege that the hearing panel or the appeal board relied on the statements of the witnesses who did not testify, and Samford's Title IX Policy expressly prohibits the panel and the board from relying on those statements. *See* D.E. 1-1 at 35. Furthermore, the investigative report included not only the statements of witnesses who confirmed Ms. Roe's account of the incident, but also the statements of witnesses who discredited Ms. Roe's claim of incapacitation. *See* D.E. 1 at 19 ¶141.

[the] investigation, they did not result in findings so devoid of substantive content as to be unworthy of credence.").[4]

Mr. Doe also alleged that there had been seven reported rapes on campus, that all of the accused students in those cases were male, and that they were treated differently than a female would have had she been charged with a similar offense. The majority says that alleged pro-complainant bias does not lead to an inference of discrimination on the basis of sex because both men and women can be accused of assault. *See* Maj. Op. at 25. I'm not sure that this is necessarily correct at the pleading stage if all of the accused students at Samford have so far been male. Nevertheless, I concur with the majority's ultimate assessment of these allegations for the simple reason that Samford does not decide who is going to make a sexual assault complaint. In other words, the sex of those who file such complaints is out of Samford's hands. And that makes it very hard to figure out how similarly situated females would be treated if they were accused of sexual assault. *See Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 91–92 (1st Cir. 2018) ("The

---

[4] Mr. Doe claims that the investigator's statement to Ms. Roe during her initial interview—"I still think, regardless, you couldn't give consent"—is evidence of gender bias against him. *See* D.E. 1 at 18 ¶ 131. But the investigator explicitly found Ms. Roe more credible than Mr. Doe because she had "several witnesses who attested to her incapacitation." *See* D.E. 1 at 19 ¶143. The hearing panel's agreement and the appeal board's affirmance of the investigator's credibility determination is not against the substantial weight of the evidence given the allegations in the complaint.

gender of the students accused of sexual assault is the result of what is reported to the [u]niversity, and not the other way around.").

Finally, Mr. Doe cites to other evidence to provide background for his claim of discrimination under Title IX. Many of our sister circuits have concluded that evidence not specifically pertaining to the plaintiff's own Title IX investigation and hearing may be relevant in assessing the sufficiency of a complaint. This evidence can include financial pressure from the government or from interest groups, scrutiny from the media, and statements or actions taken by the university, its employees, or fellow students indicating a potential gender bias against students accused of sexual misconduct. Title IX plaintiffs typically present this type of evidence to contextualize the actions taken by school officials during the investigation and/or hearing. A review of Title IX cases, however, leads me to conclude that the background evidence cited in Mr. Doe's complaint—the university magazine article, the documentary, the "It's on Us" campaign, and the Clay statistics—does not make Mr. Doe's claim of discrimination plausible. *See e.g., Purdue Univ.,* 928 F.3d at 668–670 (concluding that government financial pressure and a post with a link to an article blaming men for the problem of sexual assault gave the plaintiff "a story about why [the university] might have been motivated to discriminate against males accused of sexual assault," but could not "standing alone" get him "over the plausibility line"); *Baum,* 903 F.3d at 586 (reasoning that the Department of Education's ongoing investigation into the university "provide[d] a backdrop that, *when*

21-12840                JORDAN, J., Concurring                15

*combined* with other circumstantial evidence of bias. . .gives rise to a plausible claim"); *Columbia Univ.*, 831 F.3d at 56–59 (concluding that intense public scrutiny and media attention of the university's handling of sexual assault complaints could lead to pro-female complainant bias).

B

So what is necessary to allege a plausible claim of sex discrimination in violation of Title IX?  I agree with the majority that the text of Title IX requires allegations that would allow a court to reasonably infer that Samford made its decision "on the basis of sex."  I also agree that based on Mr. Doe's complaint we cannot plausibly infer sex discrimination by Samford in this case. My discussion below discusses why our sister circuits in *Purdue University*, *Baum*, and *Columbia University* ruled that the plaintiffs in those cases *did* cross the plausibility threshold. My hope is that the contrast will shed some light on the amorphous plausibility standard in the Title IX setting.

In *Purdue University*, the Seventh Circuit was persuaded by the plaintiff's allegation that the Title IX investigator chose to credit the complainant's account of the incident without talking to her directly.  *See* 928 F.3d at 669.  An investigator can of course make credibility determinations, but the Seventh Circuit found the investigator's "basis for believing [the complainant]… perplexing, given that [the investigator] never talked to [the complainant]" and instead relied on a letter relaying the complainant's account

prepared by the director of the university's center for victims of sexual violence. *Id.*

The allegations about the hearing also suggested that the panel was biased against the plaintiff, who was male. Crediting the plaintiff's allegations as true, the Seventh Circuit noted that "the majority of the panel members appeared to credit [the complainant] based on her accusation alone, given that they took no other evidence into account." *See id.* The plaintiff was also denied the opportunity to present any witnesses in his favor, including an alibi witness, and he was unable to present evidence of a potential source of the complainant's anger toward him: his reporting of her suicide attempt while they were dating. *See id.* These allegations, viewed within the context of financial pressure from the government and a post by a university organization seemingly blaming men as a class for the problem of sexual assault, led the Seventh Circuit to conclude that the plaintiff had pled a plausible claim of discrimination on the basis of sex. *See id* at 667–670.

The Sixth Circuit in *Baum* was concerned, based on the allegations, that the hearing panel found the plaintiff culpable of violating the university's policy even though the Title IX investigator had initially found in his favor. *See* 903 F.3d at 586. A difference in credibility determinations from the investigator and panel was not ipso facto evidence of sex discrimination, but the fact that the investigator did her work over three months, "during which she personally interviewed 23 witnesses and reviewed

21-12840                JORDAN, J., Concurring                17

evidence such as medical records, text messages, and video recordings," and that the subsequent university disciplinary panel disregarded or placed little value on the findings of the report, gave the Sixth Circuit pause. *See* Complaint at 7 ¶ 30, *Doe v. Baum*, 227 F. Supp. 3d 784 (E.D. Mich. 2017). The Sixth Circuit noted that the hearing panel "credited exclusively female testimony…and rejected all of the male testimony" and explained its decision by saying that the accused's witnesses (who were all male) "lacked credibility because many of them were fraternity brothers." *Baum*, 903 F.3d at 586. Given that the Sixth Circuit was required to "view[ ] this evidence in the light most favorable to [the plaintiff]," gender bias was certainly one plausible explanation. *Id.*

In *Columbia University* the Second Circuit spent considerable time detailing the mounting pressure the university was experiencing when it made its determination against the plaintiff. In describing the university's alleged "pro-female, anti-male bias," the Second Circuit concluded that the "biased attitudes were, at least in part, adopted to refute criticisms circulating in the student body and in the public press that [the university] was turning a blind eye to female students' charges of sexual assaults by male students." *Columbia Univ.,* 831 F.3d at 56. It therefore concluded that the failure of the investigator and hearing panel to seek out the plaintiff's corroborating witnesses, and act in accordance with the procedural policies of Title IX disciplinary proceedings, could be the result of bias and made the discrimination claim plausible. *See id.* at 56–57.

The allegations in these three cases do not set a floor for plausibility in the Title IX context. But the cases taken collectively, begin to piece together the sort of mosaic that will suffice. *See also Univ. of Ark.-Fayetteville*, 974 F.3d at 864–66 (Title IX plaintiff sufficiently made out a claim of sex discrimination by alleging that the hearing panel's decision was against the weight of the substantial evidence, that lesser sanctions were imposed in order to avoid negative media attention and to portray a stricter approach to sexual assault, and that university was under pressure on multiple fronts to find males responsible for sexual assaults).[5]

### III

I agree with the majority that Mr. Doe has not alleged sufficient facts to meet the plausibility standard. I do not, however, believe that *Twombly* and *Iqbal* require plaintiffs to rule out in their complaints plausible alternative reasons for the misconduct they challenge. Title IX plaintiffs need only allege facts that would allow us to infer a plausible claim of sex discrimination.

---

[5] With respect to Mr. Doe's claim of selective enforcement, it too fails to cross the plausibility threshold. There is no allegation that Samford, in addition to yielding to external pressures, failed to investigate female students accused of the same misconduct, as in *Doe v. University of Sciences*, 961 F.3d 203, 210 (3d Cir. 2020).

USCA11 Case: 21-12592    Date Filed: 03/24/2022    Page: 51 of 60

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

AKOS SWIERKIEWICZ,
            Plaintiff,

            v.                                    NO. 99 Civ. 12272 (LAP)

SOREMA, N.A.,
            Defendant.

## AMENDED COMPLAINT

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, plaintiff,

Akos Swierkiewicz, amends his complaint as a matter of course to state claims for relief

against defendant, SOREMA, N.A., for violations of the New York State Executive Law,

§296 et seq. and the Administrative Code of the City of New York, §8-107 et seq.

1.    This is an employment discrimination action brought by Akos

Swierkiewicz to recover damages against SOREMA N.A. ("SOREMA") for the violation

of his rights under Title VII of the 1964 Civil Rights Act, 42 U.S.C. §2000e et. seq. ("Title

VII"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. §621 et seq.

("ADEA"); the New York State Executive Law, §296 et. seq. (the "Human Rights Law");

and the Administrative Code of the City of New York, §8-107 et. seq. (the "City Law").

## JURISDICTION AND VENUE

2.    Jurisdiction over Mr. Swierkiewicz's Title VII claim is conferred by

42 U.S.C. §2000e-5(f)(3). Jurisdiction over his ADEA claim is conferred by 29 U.S.C.

§626(c)(1). Supplemental jurisdiction over his Human Rights Law and City Law claims is conferred by 29 U.S.C. §1367(a).

3.    Venue is proper in this district pursuant to the general venue statute, 28 U.S.C. §1391, and under Title VII's special venue statute, 42 U.S.C. §2000e-5(f)(3).

## PARTIES

4.    Plaintiff, Akos Swierkiewicz, resides at 821 Hudson Drive, Yardley, Pennsylvania 19067.

5.    Defendant SOREMA is a New York corporation headquartered at 199 Water Street, 20th Floor, New York, New York 10038.

6.    At all times relevant hereto, SOREMA has resided and conducted business in this judicial district.

7.    At all times relevant hereto, SOREMA has been an employer within the meaning of Title VII and the ADEA.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.    On or about July 11, 1997 Mr. Swierkiewicz filed a Charge of Discrimination against SOREMA with the Philadelphia District Office of the Equal Employment Opportunity Commission ("EEOC"), Charge No. 170971447, charging it with unlawful national origin and age discrimination in connection with his dismissal from employment.

2

USCA11 Case: 21-12592    Date Filed: 03/24/2022    Page: 53 of 60

9. By notice dated May 3, 1999 and which he received on May 5, 1999, Mr. Swierkiewicz was notified by the EEOC of his right to file a civil action against SOREMA.

10. This lawsuit has been timely filed within 90 days of Mr. Swierkiewicz's receipt of the EEOC's right-to-sue notice.

11. Pursuant to §8-502(c) of the City Law, prior to filing this Amended Complaint, plaintiff Swierkiewicz served a copy of the Amended Complaint on the City of New York Commission on Human Rights and the City of New York Corporation Counsel.

## FACTUAL ALLEGATIONS

12. Mr. Swierkiewicz is a native of Hungary. He became a United States citizen in 1970.

13. Mr. Swierkiewicz is 53 years old. His date of birth is July 25, 1946.

14. SOREMA was formed in 1989. It is a reinsurance company principally owned and controlled by a French parent corporation. At all times relevant hereto, SOREMA's Chief Executive Officer has been François M. Chavel, a French national.

15. From 1970 to 1986, Mr. Swierkiewicz was employed by INA which after its merger in 1982 with Connecticut General, became CIGNA Insurance Company. His last position at CIGNA was Vice President of Special Risk Facilities.

3

USCA11 Case: 21-12592   Date Filed: 03/24/2022   Page: 54 of 60

16.     From 1986 to 1989, Mr. Swierkiewicz was employed by SCOR U.S., a reinsurance company, as Senior Vice President for Research and Special Risks.

17.     On April 17, 1989 Mr. Swierkiewicz began his employment with SOREMA in the position of Senior Vice President and Chief Underwriting Officer ("CUO").

18.     In all respects, Mr. Swierkiewicz performed his job in a satisfactory and exemplary manner.

19.     Despite plaintiff's stellar performance, in February 1995 Mr. Chavel demoted him from his CUO position to a marketing and services position and transferred the bulk of his underwriting responsibilities to another French national, Nicholas Papadopoulo, who was 32 years old at the time (and 16 years younger than plaintiff).

20.     Mr. Chavel demoted Mr. Swierkiewicz on account of his national origin (Hungarian) and his age (he was 49 at the time).

21.     A year later, in or about February 1996, Mr. Chavel formally appointed Mr. Papadopoulo as SOREMA's CUO.

22.     Mr. Papadopoulo was far less experienced and less qualified to be SOREMA's CUO than was Mr. Swierkiewicz. Indeed, Mr. Papadopoulo had just one year of underwriting experience prior to being appointed CUO by Mr. Chavel. By contrast, plaintiff had more than 26 years of broad based experience in the insurance and reinsurance industry.

4

USCA11 Case: 21-12592    Date Filed: 03/24/2022    Page: 55 of 60

23. At the time Mr. Papadopoulo assumed plaintiff's duties as CUO, Mr. Chavel stated that he wanted to "energize" the underwriting department -- clearly implying that plaintiff was too old for the job.

24. In light of Mr. Papadopoulo's inexperience, Mr. Chavel brought in Daniel Peed from SOREMA's Houston, Texas office to support him in his CUO duties. Mr. Peed, like Mr. Papadopoulo, was in his early 30s. Shortly after his transfer to SOREMA's office in New York City, Mr. Chavel promoted Mr. Peed to the position of Senior Vice President of Risk Property.

25. Prior to his transfer, Mr. Peed had been a Second Vice President reporting to plaintiff.

26. Not long after plaintiff's demotion, SOREMA hired another French national, Michel Gouze, as Vice President in charge of Marketing. Mr. Gouze, unlike plaintiff, had very little prior experience in the insurance/reinsurance business.

27. Because of his inexperience, Mr. Gouze needed to rely on Mr. Swierkiewicz to perform his marketing duties for SOREMA.

28. Mr. Gouze's marketing duties at times overlapped with those of plaintiff. Despite Mr. Swierkiewicz's requests to better coordinate their duties, Mr. Chavel refused to accommodate those requests or to have Mr. Gouze report to plaintiff.

29. Mr. Swierkiewicz was isolated by Mr. Chavel following his demotion, excluded from business decisions and meetings and denied the opportunity to reach his true potential at SOREMA.

5

USCA11 Case: 21-12592    Date Filed: 03/24/2022    Page: 56 of 60

30. Efforts by Mr. Swierkiewicz to meet with Mr. Chavel to resolve the unsatisfactory working conditions to which he was subjected following his demotion proved unsuccessful.

31. On April 14, 1997, following two years of ongoing discrimination on account of his national origin and age, Mr. Swierkiewicz sent a memo to Mr. Chavel outlining his grievances and requesting a severance package to resolve his disputes with SOREMA.

32. Mr. Chavel did not respond to Mr. Swierkiewicz's memo.

33. In the morning, on Tuesday April 29, 1997, Mr. Chavel and Daniel E. Schmidt, IV, SOREMA's General Counsel, met with Mr. Swierkiewicz and gave him two options: either resign his job (with no severance package) or be fired.

34. Mr. Swierkiewicz refused to resign his employment with SOREMA.

35. As a result, he was fired by Mr. Chavel, effective that very day (April 29, 1997).

36. SOREMA had no valid basis to fire Mr. Swierkiewicz.

37. Plaintiff's age and national origin were motivating factors in SOREMA's decision to terminate his employment.

38. Unlike plaintiff who was fired without cause and without any severance pay or benefits, SOREMA has provided generous severance packages to a number of former executives for whom it had cause to terminate their employment. These include, but are not limited to, the following individuals: Jay Kubinak, Thilo Herda, Douglas Zale, Nigel Harley and Marcus Corbally.

6

39.    As a direct and proximate cause of his being fired by SOREMA, Mr. Swierkiewicz has suffered and will continue to suffer a substantial loss of earnings to which he otherwise would have been entitled. This includes, but is not limited to, the loss of his salary, bonus, automobile allowance and pension credits as well as the loss of his medical and dental insurance, life insurance, short and long term disability insurance and the insurance he had for accidental death and dismemberment.

40.    As a further direct and proximate cause of his being fired by SOREMA, Mr. Swierkiewicz has suffered damage to his reputation and harm to his career. He has also experienced physical pain and suffering, mental anguish, and the loss of enjoyment of life's pleasures.

41.    SOREMA acted willfully and in reckless disregard of Mr. Swierkiewicz's rights under Title VII and the ADEA by discharging him from employment on account of his age and national origin.

## STATEMENT OF CLAIMS

### COUNT I:    VIOLATION OF TITLE VII

42.    Mr. Swierkiewicz repeats and incorporates by reference the allegations of paragraphs 1 - 41 of the Amended Complaint as if they were set forth in full.

7

43.    SOREMA terminated Mr. Swierkiewicz's employment on account of his national origin and thereby violated his right to equal employment opportunity as protected by Title VII.

## COUNT II:    VIOLATION OF THE ADEA

44.    Mr. Swierkiewicz repeats and incorporates by reference the allegations of paragraphs 1 - 43 of the Amended Complaint as if they were set forth in full.

45.    SOREMA terminated Mr. Swierkiewicz's employment on account of his age and thereby violated his right to equal employment opportunity as protected by the ADEA.

## COUNT III:  VIOLATION OF THE HUMAN RIGHTS LAW

46.    Mr. Swierkiewicz repeats and incorporates by reference the allegations of paragraph 1 - 45 of the Amended Complaint as if they were set forth in full.

47.    Sorema terminated Mr. Swierkiewicz's employment on account of his national origin and/or age in violation of his right to equal employment opportunity as protected by the Human Rights Law, §296 et. seq.

8

## COUNT IV:  VIOLATION OF THE CITY LAW

48.    Mr. Swierkiewicz repeats and incorporates by reference the allegations of paragraphs 1 - 47 of the Amended Complaint as if they were set forth in full.

49.    Sorema terminated Mr. Swierkiewicz's employment on account of his national origin and/or age in violation of his right to equal employment opportunity as protected by the City Law, §8-107 et. seq.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Swierkiewicz respectfully requests the Court to enter judgment in his favor and against SOREMA, and to accord him the following relief:

(a)    Back pay with prejudgment interest and all the fringe benefits to which he is entitled;

(b)    Front pay and benefits to the extent reinstatement is not feasible;

(c)    Compensatory damages for his non-economic injuries in an amount authorized by Title VII and by the Human Rights Law and the City Law;

(d)    Punitive damages to punish and deter SOREMA from future acts of employment discrimination in an amount authorized by Title VII and the City Law;

(e)    Liquidated damages in an amount equal to twice Mr. Swierkiewicz's back pay losses as authorized by the ADEA;

(f)    An award of reasonable counsel fees and costs to compensate Mr. Swierkiewicz for having to prosecute this action against SOREMA; and

9

USCA11 Case: 21-12592   Date Filed: 03/24/2022   Page: 60 of 60

(g)     Such other legal and equitable relief or may be just and proper

under the circumstances.

## JURY DEMAND

Mr. Swierkiewicz demands a trial by jury on all the issues in this action

that are triable by law.

Respectfully submitted,

Harold I. Goodman, Esquire   (HG 4895)
RAYNES, McCARTY, BINDER, ROSS & MUNDY
1845 Walnut Street, 20th Floor
Philadelphia, PA  19103
(215)568-6190

ANNE L. CLARK, ESQUIRE  (AC 6456)
VLADECK, WALDMAN, ELIAS & ENGELHARD, P.C.
1501 Broadway, Suite 800
New York, NY  10036
(212)403-7332

Counsel for Plaintiff,
Akos Swierkiewicz

10